UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT BOWLING GREEN

ERIC ENGLAND                                                                    PLAINTIFF

v.                                                         CIVIL ACTION NO. 1:07-CV-174-R

ADVANCE STORES CO. INC.                                                         DEFENDANT

## MEMORANDUM OPINION

### INTRODUCTION

Plaintiff in this wage and hour lawsuit seeks compensation for his off-the-clock

work and for the denial of his meal and rest breaks pursuant to the Kentucky Wages and Hours

Act, KRS Chapter 337.  The named Plaintiff in the suit is Eric England, a former employee of

the Defendant, Advance Stores Company, Inc., d/b/a Advance Auto Parts (Advance Auto).

Advance Auto hired England in July of 2006, to work as assistant manager for an hourly wage at

its store located in Columbia, Kentucky.  England worked at the Columbia store from July of

2006, to May of 2007, when he voluntarily left to take employment elsewhere.  He later filed the

present suit in Kentucky state court against Advance Auto on his own behalf and on behalf of a

proposed class of hourly wage Advance Auto employees employed at its 86 stores in Kentucky.

The complaint alleges that England and the proposed class were forced by

Advance Auto to work continuously for more than four hours without a rest period, were

required to work without their statutorily required lunch breaks, and were required to work "off

the clock" without pay, all in violation of KRS Chapter 337.  England now seeks monetary

damages, both compensatory and punitive, costs and attorney's fees for himself and his proposed

class members.

After Advance Auto removed England's lawsuit to federal court in October of

2007, the company moved for summary judgment seeking the dismissal of all of England's claims. It argues that all of England's putative class claims must be dismissed because (1) his individual claims are neither common to nor typical of the claims of the proposed class, and because, (2) as a former assistant manager responsible for enforcing company wage and hour policies, he may himself well be the subject of such claims by the very members of the class that he now proposes to represent.

Advance Auto also insists that no private right of action currently exists in Kentucky for the violation of the state statutes that require rest breaks and a lunch period for employees. See KRS 337.355 and 337.365 (Michie 2007). As for England's claim of off-the-clock work, Advance Auto argues that this particular claim is *de minimis* given England's concession that he never worked more than ten minutes at a time after clocking out. Indeed, the entire amount of supposedly uncompensated time that he claims to have worked over his ten months of employment amounts to only $194.94 in unpaid wages, an amount that Advance Auto has tendered to him in potential settlement of the claim. Advance Auto also points out that as a store assistant manager, who had the authority to correct his computerized time records, England was in a unique position to avoid the very financial injury that he now protests. Finally, as for England's claim for punitive damages, Advance Auto argues that such damages are not statutorily provided under KRS Chapter 337.

England has filed a detailed response to each of these arguments (DN 55). In his view, the case is not ripe for summary judgment because he has not had an adequate opportunity to conduct discovery. Alternatively, he argues that he is an adequate class representative, as the wage and hour records provided by Advance Auto readily show that hourly wage employees,

2

both non-managerial and managerial, were routinely denied meal and rest breaks in violation of Kentucky law.  Further, according to England, all hourly wage employees of Advance Auto were required to work off-the-clock as part of the "day close" procedure at its stores in Kentucky. England therefore insists that not only do common class issues predominate, but also that he is an adequate representative for the proposed class, his former status as assistant manager notwithstanding.

England argues additionally that Kentucky clearly provides a private right of action for the violation of both KRS 337.355 and 337.365, based on Parts Depot, Inc. v. Beiswenger, 170 S.W.3d 354, 362 (Ky. 2005).  In this regard, Kentucky's wage and hour statutes must be read in conjunction with KRS § 446.070 (Michie 1999), the statute that creates a private right of action for individuals who are injured by the violation of any Kentucky statute.  Not only does he claim a private right of action, England adds that the denial of the required meal and rest breaks resulted in monetary damages to him and to the proposed class members, despite the fact that he and they both were admittedly paid their hourly wages for the time spent working during the missed breaks.  See Salvas v. Wal-Mart Stores, Inc., 893 N.E.2d 1187 (Mass. 2008).

On his claim for unpaid off-the-clock work, England argues that genuine issues of material fact prevent summary judgment on this claim, which is not a *de minimis* claim or one extinguished merely because Advance Auto, on the day prior to moving for summary judgment, mailed England a check for $194.94.  Finally, England maintains that, while KRS Chapter 337 makes no mention of punitive damages, his claim for lost meal and rest breaks incorporates such damages via KRS § 446.070 (Michie 1999).

3

## FINDINGS OF FACT

Advance Stores Company is a Virginia corporation that operates approximately 86 retail auto parts stores in Kentucky under the name Advance Auto Parts.  (DN 52, statement of undisputed material facts, p. 1, ¶ 1). The company organizes its stores into divisions that each consist of 12 to 13 stores, with each division supervised by a division manager.  (Id. at 1, ¶ 2). Each store within a division has a manager, first assistant manager and two second assistant managers.  (Id. at 2, ¶ 7).  Lynn Dudley is the store manager of Advance Auto Parts Store 8520 located in Columbia, Kentucky.  (Id. at 2, ¶ 6).  His division manager is Stacey Akin, who was himself once the manager of the same Columbia store.  (Id., England depo. at 68-69).

In July of 2006, Dudley hired the Plaintiff, Eric England, as an assistant manager at Store 8520. (Id. at 2, ¶ 3).  England worked at the store on average 50 hours per week as first assistant manager earning an hourly wage of approximately $14 per hour.  (Id. at 2, ¶¶ 4-5) (England depo. at 15-17, 54).  On taking employment, England received both in-store training and corporate training off-site from Advance Auto.  He also received a copy of the company's employee handbook, along with in-store computer instruction on Advance Auto's policies and procedures.  (DN 52, Exh. 1, Depo. Eric England, at 221).  Among the online course training that England took were classes on wage and hour policies, timekeeping, opening and closing procedures for the store, assistant store manager orientation and code of ethics.  (England Depo. at 162-174, 225-33, 244-49).

England explained during his deposition, however, that this in-store computer training seemed to be perfunctory.  (England depo. at 162-69, 225-33).  He got the impression from his co-workers that the online courses were not to be taken seriously; they were merely a

4

*pro forma* requirement that he had to pass.  England actually learned the bulk of his knowledge on procedures for opening and closing the store from his fellow employees such as Kevin Crockett, second assistant manager, and the store manager, Mr. Dudley.  (England depo. at 63-65).

Dudley, England and the two second assistant managers constituted the management team at the store.  (DN 52, statement p. 2, ¶ 7).  Although England occasionally worked with Dudley, in Dudley's absence, England was in charge of the store and the employees. (England depo. at 97-98).  Consequently, his duties as first assistant manager required him to make sure that the store employees were properly performing their jobs in accordance with company rules.  (Id. at 149-50).  England also was responsible for opening and closing the store when Dudley was not present.  England estimated that he closed store 8520 approximately three nights per week during the 10 months that he worked for Advance Auto. (England depo. at 54, 122-23).

As England explained his store's standard procedures for closing, they included such things as restocking the shelves, cleaning the restrooms, counting out and shutting down the cash registers and computer terminals, counting the cash in the store safe and preparing the bank deposit from the day's receipts.  (Id. at 186-89).  According to him, after the cash registers were counted out, then he and the other store team members would clock out electronically on the store's computer system, the APAL system.  (England depo. at 294).  He would then input the cash-on-hand amount, and the system would advise him whether the store had balanced its cash accounts or was over/under the projected total.  (Id. at 190-95).

England explained that he and the other store employees clocked out and then put

5

in the dollar amounts into the computer system because once the dollar amounts of receipts and cash on hand were entered, and the "end of business day" function was executed on the "Back Office" menu, it was not possible to go back into the APAL computer system and electronically clock out.  (Id. at 214-15).  Once he hit the "end of day" button on the APAL system, the system was shut down for the day and could not be restarted without beginning a new work day.  (Id.).  When asked why he routinely executed the "end of business day" function at that point in the closing process, England explained that this sequence of steps was the only way that he had ever seen the store closing procedures performed or was trained to close the store.  In fact, England was surprised when he was advised during his deposition that the standard operating procedures for the APAL computer system store closing program did not require him or the other employees to clock out before entering the amount of cash on hand in the store safe.  Finally, after getting the store's balance, England would be required to e-mail the division manager, Stacey Akin, with the over/under number and an inventory accounting number referred to as the "shrink." After that, assuming that the cleanup and restocking was complete, England would turn off the lights, set the alarm for the store, and exit with the other employees.

England testified that the other store employees would routinely clock out before completing their closing duties such as cleanup and restocking.  (England depo. at 198-200).  He normally would be in the back of the store working with the APAL computer system and would ask the other employees if they were done.  Many times, these employees would maintain that they had finished and would clock out only to have to continue working to complete their off-the-clock duty.  (Id.).  England testified that it was expected of the employees to clock out before finishing their work, although he could not point to any written policy or procedure of Advance

6

Auto that required such behavior.  (Id. at 201).  It was simply the way that the closing procedures were taught to him by his fellow store employees, Lynn Dudley and Kevin Crockett.  (Id. at 203-04).

England related that whenever he closed the store with Dudley, he would complain about this practice of store employees clocking out before all of their work was finished.  (England depo. at 210).  Yet, England admitted that he never complained to division manager Akin, or the company human resources manager, Alan Parton.  (England depo. at 74-76, 130-33, 210-213).  He admittedly did not call the company ethics hotline, which permitted employees to anonymously complain about unethical or unlawful employment conditions or practices.  England simply didn't think that any such complaints would do him any good.

England acknowledged that a copy of the Advance Auto employee handbook was available at the store where he was employed.  (England depo. at 221).  He also admitted that the handbook contained a section on the code of ethics which provided that the company and its employees must comply with all federal, state and local laws that apply to its business.  (Id. at 222-23).  He agreed that the same ethics code provided an "800" telephone number for employees to call to report any such violations.  (Id. at 224).  Further, he admitted that he was required to take online computer training on the company code of ethics, which included principles of honesty, fair dealing and compliance with the law.  (Id. at 225-26).

England acknowledged that one portion of the code of ethics training program related to the obligation of company employees to comply with all federal, state and local employment laws, and that if there is any uncertainty about what is required by the law, the employee should seek further guidance without delay.  (Id. at 229-30).  England admitted that

7

the only guidance he sought was from the store manager, Lynn Dudley, who did not provide him with a satisfactory answer to his complaints about off-the-clock work.  (Id. at 233). Dudley, for his part, filed an affidavit in which he stated that he could not recall that England had ever made such complaints to him.  (DN 52, Exh. Aff. Dudley).

England conceded during his deposition that the company's ethics training program required that all Advance Auto team members accurately report and record hours worked.  Nevertheless, he did not complain to anyone other than the store manager about the off-the-clock work.  England explained that he did not want to rock the boat.  (England depo. at 233-36).  Also, he simply thought it would not be helpful to complain. (Id.). When he did bring up the subject to Dudley, he could not get a straight answer, and the division manager, Stacey Akin, was distant and unapproachable. (Id.).  Plus, Akin had been the prior store manager at store 8520 before being promoted to division manager, so England simply assumed that Akin was well aware of the unwritten off-the-clock work policy at the store.  (Id. at 237).  Consequently, all England ever did was to get his complaints off of his chest by talking to Dudley, whom he hoped would take his concerns farther up the chain of company management.  (Id. at 243-44).

During his deposition, England also was confronted with the Fair Labor Standards Act (FLSA) computer training that he completed upon taking employment with Advance Auto.  (Id. at 244-45).  England acknowledged that the computer training included recognition of FLSA issues to ensure fair treatment and compensation for all Advance Auto team members.  (Id. at 246-47).  He admitted that the online FLSA training program provided that team members must be paid for all hours worked in a work week to include all hours that a team member is at work.  (Id. at 247).  Faced with this language from the FLSA computer training he took, England

8

admitted that allowing employees to work off-the-clock, contrary the company's written policy, could be grounds for termination of employment, although in his opinion, such things had occurred at his store and had never resulted in the termination of any employee.  (Id. at 248).

As for rest breaks and lunch periods, the FLSA training materials for Advance Auto advised employees to contact the regional human resource manager to determine the state law guidelines applicable to their particular store.  (Id. at 249-53).  England acknowledged that he never contacted the company human resources manager about meal or rest breaks, just as he never contacted the human resources manager about off-the-clock work.  (Id. at 254).  England pointed out, however, that while the same training materials indicated that all breaks and meal periods must be scheduled by the immediate supervisor for the team members, he had never scheduled a meal or rest break for any store employee, nor was a meal or rest break ever scheduled for him during the entire time he worked at store 8520.  (Id.).

England did acknowledge that generally, a 30-minute break for lunch was scheduled for store employees, but not rest breaks, which were never scheduled.  Further, while lunch breaks were scheduled, employees were never able to actually take an uninterrupted lunch break, according to England, due to the company policy that required there be two employees on the store sales floor at all times to assist customers, take phone calls and otherwise operate the store.  In England's view, this was just another example of how the written policies of Advance Auto conflicted with the actual procedures practiced in the store where he worked.  England agreed, however,  that he had no firsthand knowledge of how such business practices and procedures were conducted at the other 85 Advance Auto stores in Kentucky.  He also conceded that the FLSA online training indicated that rest breaks should be scheduled around the need of

the business, a circumstance that he believed could conflict with the requirements of Kentucky wages and hour law in his own store.

During his deposition, England agreed that the employee handbook contained a statement that every Advance Auto team member must record all his or her hours worked on a daily basis.  The handbook also reinforced the point that off-the-clock work was not permitted by the company's official policy.  Once again, however, England testified that he simply followed the policy actually in effect at the store where he worked, a *de facto* policy that he personally believed existed at other Advance Auto stores in Kentucky, despite the written materials of the company to the contrary.

The APAL computer system at the store where England worked contained the standard operating procedures, or SOPs, for the daily close of the store.  (England depo. at 259). England acknowledged that such SOPs described the manner in which Advance Auto intended for its stores to be closed at the end of the day.  England had never seen these SOPs, however, and was not familiar with them.  (Id. at 260-61).  He acknowledged that a printed "daily to do" list was available in the store, but according to him none of the employees used it.  (Id. at 262).

As for the daily close SOP steps, England explained that the daily closing procedure that he was trained at the store to perform did not coincide with all of the steps listed in the APAL computerized daily close SOP.  (Id. at 266-270).  Unlike the daily close SOP, England was trained at store 8520 to clock out before inputting the amount of cash from the store safe into the APAL system.  In his own words

> When you get the numbers for the safe, it's after you're out of that
> screen where you can go back and affect anything and that's only
> when it tells you what your total over/short is for the day because
> you haven't put the safe [amount] in there at that point.

10

> And at that point, before you can put that [the safe amount] in
> there, you have to clock out because if you don't, then you lose the
> opportunity to clock out, and then the manager that comes on the
> following morning, I guess, would have to assume or you would
> have to hand-write it or something that would not be as clear and
> concise as actually me, the employee, putting my Social Security
> number in to clock out or my employee number.

(DN 52, Ex. 1, England Depo. 270).

England admitted during his deposition that the company's written SOP for the daily close did not have the employees clocking out until step 20 of the 27-step process immediately before the step at which the closing store employee is supposed to click on the "close the store" command that initiates the printing of the daily reports and shuts down the computer system. (Id. at 273-74). At that point, according to the printed Advance Auto SOP for daily close, nothing is left to do except to check the parking lot, set the store alarm, unlock the front door, exit the store and relock the door. (Id.).

While England did not dispute the contents of the computer printed SOP, he insisted that as the APAL system *actually* worked in his store, it was absolutely necessary for the employees to clock out of the system before inputting the amount of cash in the store safe, which at that point in the procedure would result in the computer providing the over/under amount that England would e-mail to Stacey Akin. (Id. at 277). Thus, as England explained it, by step no. 13 of the 27-step daily close SOP, he and the employees at his store had already clocked out due to necessity. (Id. at 273-276). In fact, both store 8520 employees, Kevin Crockett and Eric Jennings, performed the daily close procedures in exactly the same fashion as England did. (Id. at 275-76). The same was true at the Advance Auto store located in Russell Springs, Kentucky on the day that England worked there. (Id.).

11

England conceded during his deposition, however, that he did not know the closing procedure for every store in Kentucky.  (Id. at 276).  In fact, the procedure at Russell Springs was slightly different from that at store 8520.  (Id.). At the Russell Springs store, employees had to wait for the daily report to print out of the computer system and then they would "do the return shelf."  (Id. at 276).  As for the company SOP on daily closing, England offered that he was not sure that the Russell Springs store employees were even aware of the existence of the company's SOP, just as he was not aware of it himself.

All that England knew was that in the two stores where he had worked, store 8520 and the Russell Springs store, employees had to clock out through the APAL system *before* they entered the dollar amount in the store safe for the APAL program to function.  (Id. at 278).  England admitted that beyond this experience it would be "conjecture for me to say that all stores had to do it, but I would say that every store that I knew about had to do it."  (Id. at 278).

England estimated that on a regular basis it would take at least several minutes to complete steps 20 through 27 of the company's daily closing SOP.  (Id. at 280).  England nevertheless reiterated that the store closing procedures at his store simply "did not happen this way."  He had "never seen this form [the 27-step daily closing SOP] form...."  (Id. at 284).

Apparently, in March of 2007, approximately two months before England voluntarily left employment with Advance Auto to accept work elsewhere, the daily store closing SOP changed, although England was not aware of the change.  (Id. at 285).  He did recall that Advance Auto stores implemented a new automatic money counting technology known as

"Teller Mate."[1]  (Id. at 286).  Under the new store closing SOP, employees were to clock out at step 33 of the daily close of store SOP.  (Id.).  After this step, the only remaining duties included waiting for the printer to print out the end of day report, putting the deposit drop bag in the store safe, turning off the lights, checking the parking lot, setting the store alarm and leaving out the front door, locking it as you go.

England estimated that these final steps would take several minutes to complete. When shown a computer screen printout from the company's new 33-step daily close procedures that permitted an employee to select the manager override feature to continue to end of day procedure with the store employees clocked in, England explained that he always clicked on "no" to decline this manager override function (Id. at 295).  According to England, everyone at the store declined the manager override function in the APAL computer procedure for store closing.  Once the employee selected "no" and declined the manager override function, then the store employees would be required to clock out according to England.  (Id. at 296).  England observed that this same manager override feature was included in the shorter 27-step store closing procedure, as well.  Just as before, he and the other employees at store 8520 declined the manager override function of the program because, according to England, if he had clicked "yes," there still would be no opportunity to clock out later.  (Id. at 299-300).

Only after leaving employment with Advance Auto did England hear offhand from another company employee, Neil Goodin, that there was a different procedure to clock out after starting the end of the day computer program.  In sum, England was not aware of the ability

_____

[1]  The Teller Mate technology involved a mechanical attachment to the cash registers at the store that counted the bills and coins in registers by their weight and entered the totals into the APAL computer system (Id. at 286).

to electronically clock out of the store after executing the manual override function on the APAL computer program.  In fact, England testified that he had never even seen the final two standard computer screens of the 33-step SOP for daily store closing.  (Id. at 301).

England agreed that no printed computer records would show how much time an Advance Auto employee worked off-the-clock.  (Id. at 309).  Further, England does not dispute that he was fully paid for the time that he was clocked in and working at the store.  (Id.).  He also conceded that if he, as assistant manager, knew that certain employee time records were inaccurate, he had the authority to go into the APAL computer system and edit the incorrect time records.  (Id. at 310-311).

England testified that he believed such off-the-clock violations and violations of the meal and rest break requirements happened to many Advance Auto employees in Kentucky, but that he did not know for sure that it did.  (Id. at 323-25).  The basis for his belief, however, was only his experience at store 8520 and the Russell Springs Advance Auto store.  (Id.). Finally, England conceded that he could not name any other Advance Auto employees at other Advance Auto stores in Kentucky than the above two stores who had been denied pay or their required rest and meal breaks.  (Id. at 326).

## CONCLUSIONS OF LAW

a.      **Rule 56 Standard.**

The standard of review of Rule 56 of the Federal Rules of Civil Procedure governs consideration of the summary judgment motion filed by Advance Auto.  Under the Rule, summary judgment will be proper if the pleadings, depositions, answers to interrogatories and

admissions on file, together with any affidavits, show that no genuine issue as to any material

fact exists, and that the moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P.

56(c).

        The party who files a motion for summary judgment bears the initial burden to

show that no genuine issues of material fact exist.  Celotex Corp. v. Catrett, 477 U.S. 317, 322,

23 (1986); Yeschick v. Mineta, 521 F.3d 498, 502 (6th Cir. 2008).  This burden may be

discharged by "pointing out ... an absence of evidence to support the nonmoving party's case."

Celotex Corp., 477 U.S. at 325; Cincinnati Newspaper Guild v. Cincinnati Inquirer, 863 F.2d

439, 443-44 (6th Cir. 1988).  Once the moving party has met this initial burden, the nonmovant,

after adequate time for discovery, may not rest on its pleadings to defeat the motion, but instead

must identify specific material facts on which a reasonable juror could return a verdict for the

nonmovant on the challenged claim or claims.  Matsushita Elec. Industries Co. v. Zenith Radio

Corp., 475 U.S. 574, 587-88 (1986).

        In this respect, the inquiry on a motion for summary judgment is similar to the

directed verdict inquiry - - whether the evidence presents a sufficient disagreement to require

submission to a jury, or whether it is so one-sided that one party must prevail as a matter of law.

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986); McKee v. Cutter Laboratories,

Inc., 866 F.2d 219, 220 (6th Cir. 1989).  The production of a mere "scintilla" of evidence by the

nonmovant will not be sufficient to defeat an otherwise proper motion for summary judgment.

Id.  When determining what particular facts are deemed to be material for the purpose of the

Rule, the Court will look to the substantive law that governs the claim or claims under

consideration.  See Street v. J.C. Bradford & Co., 886 F.2d 1472, 1476-81 (6th Cir. 1989)

15

(extended discussion of the summary judgment standard).

As Judge Bertelsman explained in the Street decision, the trilogy of Celotex, Matsushita, and Anderson have ushered in a "new era" in summary judgment jurisprudence under which the federal courts have enhanced discretion to grant summary judgment. No longer need they independently search the record merely to deny a motion for summary judgment based upon some "metaphysical doubt as to the material facts." Street, 886 F.2d at 1480 (citing Matsushita, 106 S. Ct. at 1356). Summary judgment will be appropriate on a given claim when the facts, viewed most favorably to the nonmovant, would not permit a reasonable juror to return a verdict in the nonmovant's favor.

**b.      England's Request for Additional Discovery.**

Now that the standard for summary judgment has been set, the first task of the Court is to determine whether the case is presently ripe for such consideration. England insists that his case is not now in a posture where summary judgment can be fairly and fully considered. He points out that when Advance Auto filed its motion for summary judgment in October of 2008, he had outstanding discovery requests that had not been fully answered by the Defendant. These discovery requests included the employment records of various Kentucky employees of Advance Auto needed by the Plaintiff to establish his wages and hours claims. Accordingly, England begins his response to the motion for summary judgment by requesting that the Court decline to consider its merits until further discovery can be completed.

The Court considers this argument in the context of Rule 56(f) of the Federal Rules of Civil Procedure. Under Rule 56(f), if a party faced with a motion for summary

judgment establishes by affidavit specific reasons why that party presently cannot respond with facts essential to support its opposition, then the District Court may either deny the dispositive motion, order that a continuance be had so that discovery may be completed, or issue any other order it deems just.  Fed.R.Civ.P. 56(f) (West 2009).

A party that seeks to invoke Rule 56(f) must do so in good faith, must explain in specific terms why he cannot adequately respond, and must demonstrate how the postponement of the ruling on the motion will enable him to rebut a showing by the movant of the absence of a genuine issue of material fact.  United States v. Certain Real Property Located at 116 Girard, Royal Oak, MI, 71 F. Supp. 171, 173-74 (E.D. Mich. 1992).  When the time period allocated for discovery has expired at the time the party opposing the motion files its brief in response, the respondent must demonstrate good cause to invoke the rule.  York v. Tennessee Crush Dome Assoc., 684 F.2d 360, 362 (6th Cir. 1982).

In order to obtain relief pursuant to the rule, it is essential that the party requesting such relief file the affidavit referred to in Rule 56(f).  Blott v. General Motors Corp., 71 F.3d 1190, 1996-97 (6th Cir. 1995), cert. denied, 517 U.S. 1157 (1996) (citing Klepper v. First American Bank, 916 F.2d 337, 343 (6th Cir. 1990) (affirming the grant of summary judgment despite insufficient discovery where the appellant failed to file a Rule 56(f) affidavit).  See also Emmons v. McLaughlin, 874 F.2d 351, 356-57 (6th Cir. 1989) (same); Shavrnoch v. Clark Oil and Refining Corp., 726 F.2d 291, 294 (6th Cir. 1984) (same).

Additional factors that the Court will consider include: (1) when the party opposing the summary judgment motion learned of the issue that is the subject of the additional discovery it desires; (2) whether the desired discovery would change the outcome of the ruling

on the motion; (3) the length of time that discovery had been ongoing at the time that the motion

for summary judgment was filed; (4) the diligence, or lack thereof, by the party seeking

additional time for discovery; and (5) whether the party moving for summary judgment was

sufficiently responsive to the nonmoving party's discovery requests.  Frank v. D'Ambrosi, 4

F.3d 1378, 1384 (6th Cir. 1993); Gordon v. Barnes Pumps, Inc., 999 F.2d 133, 138 (6th Cir.

1983); Rhodes v. McDannel, 945 F.2d 117, 119 (6th Cir. 1991), cert denied, 502 U.S. 1032

(1992).

       The Court has considered all of the above factors in light of the procedural history

of the case.  A review of the record reveals that virtually all of the discovery concerns raised by

England in his response to the motion for summary judgment were resolved when the Magistrate

Judge favorably ruled on England's motion to compel.  England had filed the motion to compel

in September of 2008 (DN 44), approximately one month prior to the time that Advance Auto

filed its motion for summary judgment (DN 52).  On December 9, 2008, the motion to compel

was granted in substantial part, thereby providing England with responses to his outstanding

discovery requests (DN 61).

       In his order, the Magistrate Judge specifically addressed the question of whether

England at that time had been afforded adequate opportunity for discovery.  After setting forth

the standard of Rule 56(f), the Magistrate Judge concluded that England was entitled to an

additional period of discovery prior to the Court addressing the merits of Advance Autos

pending summary judgment motion (DN 61, p. 26).  Specifically, the order stated:

> When the Court considers the nature of the discovery sought, the
> length of the discovery period, whether the adverse party was
> responsive, and whether the moving party was dilatory, it must
> conclude that all of these factors support a brief period for

additional discovery before the Court will address the merits of
Advance's motion for summary judgment.  See Audi AG v.
D'Amato, 469 F.3d 534, 541-42 (6th Cir. 2006); Abercrombie &
Fitch Store, Inc. v. American Eagle Outfitters, Inc., 280 F.3d 619,
627 (6th cir. 2002) ("Summary judgment is improper if the non-
movant is not afforded a sufficient opportunity for discovery.")
(citing Vance v. United States, 90 F.3d 1145, 1148 (6th Cir. 1996)).

For these reasons, England shall be afforded the opportunity of
obtaining his requested discovery from Advance.  Should the
requested discovery justify an addition to his response to the
pending motion for summary judgment motion, England may make
a motion to supplement his response with any additional arguments
or information obtained through the discovery.  Advance will be
afforded the opportunity to timely respond to the substance of any
such supplement.  At this point, the Court holds consideration of
Advance's motion for summary judgment **IN ABEYANCE** for 60
days, or until such time as the Court is notified that sufficient
discovery has been exchanged to permit the motion to be fully
addressed by the Plaintiff.

(DN 61, pp.26-27).

Since the order was entered on December 9, 2008, Advance Auto has come

forward with literally thousands of pages of discovery.  These documents were provided to

England in late January and late February of 2009.  England therefore has now had more than six

months in which to analyze such documents, seek additional discovery if necessary, and move to

supplement his response to the motion for summary judgment if additional material facts or

arguments were revealed from his review.  England has filed a notice of supplemental authority

in support of his response (DN 94), but otherwise has not moved to supplement his response in

any other fashion.  In view of these circumstances, the Court cannot help but believe that the

time is now ripe for consideration of the merits of Advance Auto's pending summary judgment

motion.  Accordingly, it rejects England's initial Rule 56(f) argument.

19

c.      **Meal and Rest Break Claims.**

The Court turns its attention next to the argument of Advance Auto that no private right of action exists under the Kentucky Wages and Hours Act for an employee to recover monetary damages against a defendant employer who allegedly violates the provisions of KRS Chapter 337 on mandatory meal and rest breaks.[2]  This issue is not resolved conclusively in the courts of Kentucky.

Only a relatively few published state court decisions address the relevant statutory provisions of KRS Chapter 337.  See Commonwealth v. Toyota Manuf. Kentucky, __ S.W.3d ___, 2009 WL 735835 (Ky. 2009) (nonfinal opinion); Parts Depot, Inc. v. Beiswenger, 170 S.W.3d 354, 357-62 (Ky. 2005) (overruling Early v. Campbell County Fiscal Court, 690 S.W.2d 398 (Ky. App. 1985) and Noel v. Season-Sash, Inc., 722 S.W.2d 901 (Ky. App. 1986)).  The federal courts of this circuit likewise have had little to say about the Kentucky Wages and Hours Act in general, and less about the statutes that provide for meal and rest breaks, KRS 337.365 (Michie 2007) and KRS 337.355 (Michie 2007).  See Oaks v. 3M Co., 453 F.3d 781, 782-83 (6th Cir. 2006); Thompson v. Kosair Children's Hosp., Case No. 3:98CV-400S, 2000 WL 34248864 at *3-4 (W.D. Ky. Jan. 24, 2000), aff'd 10 Fed. Appx. 336 (6th Cir. May 16, 2001) (per curiam) (unpublished disposition).

---

[2]  The parties in their motion papers for and against entry of summary judgment initially addressed the question of whether England is an adequate class representative under Rule 23 of the Federal Rules of Civil Procedure, and whether sufficient common legal and factual issues exist to satisfy the requirements of the Rule.

While such questions are undeniably important in this litigation, logic suggests that the analysis should first focus on whether England may even bring a claim to recover for missed meal and rest breaks, before questions relating to the class action status requirements that involve a number of such supposedly similar claims may be appropriately considered.

The provisions of KRS Chapter 337 that establish the requirement for periodic rest breaks and lunch breaks are clearly written.  Employers are required by KRS 337.355 (Michie 2007) to grant their employees a reasonable period for lunch as close to the middle of the employee's scheduled work shift as possible, and no sooner than three hours after the beginning of the work shift, or later than five hours thereafter.  KRS 337.355 (Michie 2007).  The second statute, KRS 337.365 (Michie 2007), provides that for each four hours of work performed an employee is entitled to a 10-minute rest period in addition to the aforementioned lunch period with no reduction in the employee's compensation.  Id.  The penalty section of KRS Chapter 337 found at KRS 337.990 (Michie 2007) provides that any employer who violates the statutory rest break requirement "shall be assessed a civil penalty of not less than $100 nor more than $1,000."  KRS 337.990(10) (Michie 2007).

Other than this statute, the sole remaining provision of KRS Chapter 337 that speaks directly to potential employer liability is found at KRS 337.385.  Subsection (1) of the statute provides that

> any employer who pays any employee less than wages and overtime compensation to which such employee is entitled under or by virtue of KRS 337.020 to 337.285 shall be liable to such employee affected for the full amount of such wages and overtime compensation, less any amount actually paid to such employee by the employer, for an additional equal amount as liquidated damages, and for costs and such reasonable attorney's fees as may be allowed by the court.

KRS 337.385 (Michie 2007).

No mention of rest breaks or a lunch period is found in the quoted language from the statute.  Just as importantly, the range of wage and hour statutes cited in the quoted portion does *not* include KRS 337.355 or KRS 337.365 among the statutes the violation of which may

21

result in employer liability.  This omission, as Advance Auto recognizes, is significant in that it strongly suggests that the legislature did not intend to create in KRS Chapter 337 a private right of recovery for employees denied their rest or meal breaks by their employer.  Had it chosen to do so, the Kentucky legislature could have easily included the statutes relating to meal and rest breaks within the language of KRS 337.385(1) (Michie 2007).  It did not do so, and the general rule of statutory construction, that the enumeration of particular statutes excludes those statutes not specifically mentioned, leads the Court to believe that no such private right of action may be found solely in KRS Chapter 337.

In fact, as Advance Auto notes, other statutory provisions in KRS Chapter 337 indicate that violation of the meal and rest break requirements may well be a matter for the Executive Director of the Office of Workplace Standards. See KRS 337.010(1)(a) (Michie 2007) (defining the term "Executive Director").  Under the statute relating to appeal of the Executive Director's orders, KRS 337.310 (Michie 2007), all orders or decisions of the Executive Director made under KRS 337.020 to 337.405 may be appealed and an administrative hearing is required to be conducted on appeal in accordance with KRS Chapter 13B.

When this statute is read in conjunction with the earlier mentioned statute on civil penalties, KRS 337.990, it becomes clear that, at a minimum, the Kentucky Wages and Hours Act envisions that violations of KRS 337.355 and 337.365 are to be handled administratively through the Office of Workplace Standards with employers being subject to a potential civil penalty of between $100 and $1,000 for any violations of either statute.  This reading of the remedial scheme of KRS Chapter 337 is reinforced when one considers that the only location in the chapter which includes KRS 337.355 and KRS 337.365 in the context of an employee's

22

potential recourse is KRS 337.310 (Michie 2007).  Had the Kentucky legislature chosen to include either of these two statutes outside this limited context, it could readily have done so by the simple expediency of including violations of either statute within the employer's liability provision of KRS 337.385(1) (Michie 2007).  As the matter now stands, that statutory provision is limited to civil actions for nonpayment of wages and/or overtime compensation due an aggrieved employee.

Advance Auto points to Thompson v. Kosair Children's Hosp., Case No. 3:98CV-400-S, 2000 WL 34248864 (W.D. Ky. Jan. 24, 2000) (unpublished disposition) as support for its view that no private right of action exists in Kentucky for the denial of lunch and rest breaks.  Thompson involved an employment lawsuit brought by a technologist in the radiology department of the defendant hospital.  The plaintiff in Thompson alleged that she was denied cross-training in the use of CAT-scans as the result of her age and disability in violation of the ADEA, 29 U.S.C. §621, *et seq*. and the Kentucky Civil Rights Act, KRS 344.010, *et seq*.  In addition, she alleged that the hospital failed to provide her with lunch breaks or rest periods in violation of KRS 337.355 (Michie 2007) and KRS 337.365 (Michie 2007).

In the face of these claims, the defendant Kosair Children's Hospital filed a motion for summary judgment.  While the hospital conceded that occasionally emergency patient care resulted in an employee missing lunch or a rest break, it argued that Thompson's statutory claims under KRS 337.355 and 337.365 were not properly before the court because she had not availed herself of the required administrative process put in place by KRS Chapter 337 and because Chapter 337 does not provide the state's circuit courts with original jurisdiction to address such claims.  Therefore, Kosair reasoned that the federal district court lacked jurisdiction

23

over the lunch and rest break claims.  <u>Thompson</u>, 2000 WL 34248864 at *3.

     The district court agreed with the hospital based on the decision of <u>Early v.</u>

<u>Campbell County Fiscal Court</u>, 690 S.W.2d 398 (Ky. App.1985) explaining that in <u>Early</u>

> the Court examined when jurisdiction attached to the Campbell
> County, Kentucky Circuit Court under KRS Chapter 337. The
> Court held that "... although the circuit court is a court of
> competent jurisdiction referred to in KRS 337.385(1), it is not one
> of original jurisdiction.  Its 'competent jurisdiction' does not attach
> until after the Labor Commission has conducted his own
> proceeding, i.e., it is involved only in review, not in initial
> resolution."  <u>Id</u>. at 399.  Furthermore, the introductory language of
> 803 KAR 1:035 states: "KRS 337.310 requires the Commissioner
> of Workplace Standards, Labor Cabinet, to decide all questions of
> fact arising under KRS 337.020 to KRS 337.405."
>
> Thompson argues that the Court's holding in <u>Early</u> applied only to
> wage disputes and not workplace breaks claims brought under
> KRS 337.355 and KRS 337.365.  According to 803 KAR 1:035
> and KRS 337.310(1), however, all claims brought pursuant to any
> provision from KRS 337.020 through KRS 337.045 must first be
> brought before the Labor Cabinet to resolve questions of fact.
> Thus, Thompson's claims also must first be brought before the
> Labor Cabinet Commissioner.

<u>Thompson</u>, 2000 WL 34248864 at *4.

     <u>Thompson</u> then turned to the related argument of the plaintiff that even if KRS

Chapter 337 required her to proceed administratively before the Executive Director of the Office

of Workplace Standards, her claim for missed lunch and rest breaks remained properly before the

federal district court pursuant to KRS 446.070, Kentucky's statute that provides that "a person

injured by the violation of any statute may recover from the offender such damages as he

sustained by a reason of the violation" even if a penalty or forfeiture is otherwise imposed by the

Kentucky statutes.  This is the same argument raised by England in response to the notion that

Kentucky's Wages and Hours Act contains no private remedy for the denial of lunch and rest

24

breaks.

> In rejecting this argument, <u>Thompson</u> explained:
>
> In <u>Grzyb v. Evans</u>, 700 S.W.2d 399 (Ky. 1985), the Kentucky Supreme Court held that "[u]nder KRS 446.070, a person injured by the violation of any statute may recover from the offender such damages as he sustained by a reason of the violation.  But this is limited to where the statute is penal in nature, or where by its terms the statute does not prescribe the remedy for its violation.  <u>Id</u>. at 401 (citing <u>Hackney v. Fordson Coal Co.</u>, 230 Ky. 362, 19 S.W.2d 989 (Ky. 1929)).  The court went on to state that "[w]here the statute both declares the unlawful act and specifies the civil remedy available to the aggrieved party, the aggrieved party is limited to the remedy provided by the statute."  <u>Id</u>.
>
> KRS 337.990 clearly specifies the civil penalties for violations of any of the provisions of KRS Chapter 337.  Therefore, under <u>Grzyb</u>, KRS 446.070 is not applicable and Thompson must look to KRS Chapter 337 alone for the proper remedy.  Thompson has not followed the administrative prerequisites of KRS Chapter 337, and this court therefore does not have jurisdiction over her Kentucky wage and hour claims.  Additionally, Thompson seeks damages pursuant to KRS 337.990(14).  KRS 336.385 states that only the Commissioner of Labor has the power to seek imposition of any penalty under KRS Chapter 337.  Accordingly, Kosair's motion for summary judgment on Thompson's claims under KRS 337.355 and KRS 337.365 will be granted.

<u>Thompson</u>, 2000 WL 34248864 at *4.

Advance Auto concludes based on this quotation that <u>Thompson</u> puts to rest any notion that a private right of action exists in Kentucky for employees to recover damages from an employer based only on the violation of their statutory right to lunch and rest breaks. Advance Auto adds that despite recent developments in Kentucky case law involving KRS Chapter 337, <u>Thompson</u> remains good law that now compels the Court dismiss this portion of England's suit.

England in his opposition to the summary judgment motion insists that Advance

25

Auto's reliance on Thompson is entirely misplaced given the 2005 decision of the Supreme Court of Kentucky announced in Parts Depot, Inc. v. Beiswenger, 170 S.W.3d 354, 357-62 (Ky. 2005).  In Parts Depot, the Supreme Court of Kentucky, according to England, directly overruled the decision that Thompson is based upon, Early v. Campbell County Fiscal Court, 690 S.W.2d at 398, along with another decision, Noel v. Season-Sash, Inc., 722 S.W.2d at 901.  According to England, the Early decision held prior to its reversal that no private right of action under KRS Chapter 337 existed for an employer's violation of the Kentucky Wages and Hours Act. (DN 55, p.13).  This holding in Early was based on the language of a prior version of KRS 337.310 in existence when Early was rendered in 1985.

At that time, KRS 337.310 provided that all disputed questions of fact involving the Wages and Hours Act were to be resolved by the Executive Director.[3]  Subsequently, the Kentucky legislature revised KRS 337.310 in 1996 to remove the condition that all questions of fact arising under KRS 337.020 to KRS 337.045 be decided by the Executive Director.[4]  The

---

[3]  The earlier version of KRS 337.310(1) provided prior to its amendment in 1996 as follows:

> (1) All questions of fact arising under KRS 337.020 to 337.405 except as provided in this section, shall be decided by the Secretary [now Executive Director].  There shall be no appeal from the decision of the Secretary on any question of fact, but there shall be a right of review by the circuit court.  Either party may, within twenty (20) days after the rendition of a final order of the Secretary, by petition appeal to the circuit court that would have jurisdiction to try an action for breach of contract.

Parts Depot, Inc., 470 S.W.3d at 359.

[4]  The Kentucky legislature in 1996 amended KRS 337.310 to remove much of the language found in the prior version of the statute.  Effective July 15, 1996, KRS 336.310 read in its entirety as follows:

Supreme Court of Kentucky in <u>Parts Depot</u> addressed the impact of this statutory change, given

the specific statutory right of employees arising under KRS 337.385 to proceed in court to

recover unpaid wages and overtime due them.  In other words, the fundamental question in <u>Parts</u>

<u>Depot</u> was whether the aggrieved employees must proceed administratively before the Executive

Director in all such unpaid wage and overtime disputes, as originally required by KRS

337.310(1) prior to its amendment, or whether the same employees were entitled, following the

1996 amendment of the statute, to proceed directly in state circuit court, the court of general

jurisdiction in Kentucky, to recover their unpaid wages and overtime under KRS 337.385.

        <u>Parts Depot</u> resolved this statutory conflict by rejecting the result of both <u>Early</u>

and <u>Noel</u>.  Both decisions required aggrieved employees to proceed administratively in the first

instance with their claims.  The role of the state circuit court in Kentucky was limited to that of

an appellate court primarily to review questions of law in apparent contradiction to the terms of

KRS 337.385(1).  In this regard, the Kentucky Supreme Court held:

> We conclude that both <u>Early</u> and <u>Noel</u> misconstrued the effect of
> the statutory scheme.  "The applicable rule of statutory
> construction whether it is both a specific statute and a general
> statute seemingly applicable to the same subject is that the specific
> statute controls....  KRS 337.310 purports to apply generally to all
> wage and hour disputes and KRS 337.385 applies specifically to an
> employer's liability for unpaid wages.  In fact, the title of the latter
> [statutory] provision is 'employer's liability - - unpaid wages and
> liquidated damages.'  <u>Early</u> erroneously concluded that KRS
> 337.310 always takes precedence over KRS 337.385; and <u>Noel</u>

---

> All orders or decisions of the Executive Director issued or made
> under KRS 337.020 to 337.405 may be appealed, and upon appeal
> an administrative hearing shall be conducted in accordance with
> KRS Chapter 13B.

(DN 55, Ex. H).

> erroneously concluded that KRS 337.310 takes precedence over
> KRS 337.385 when the dispute involves failure to pay a statutory
> minimum wage.  We now hold that KRS 337.385, the more
> specific statute, takes precedence over KRS 337.310, the general
> statute, whenever any employee, or the Commissioner on [the]
> employee's behalf, chooses to exercise the judicial remedy for
> recovery of unpaid wages.  To the extent that <u>Early</u> and <u>Noel</u> hold
> otherwise, they are overruled.
>
> ....
>
> Nothing in that language [of KRS 337.310] or in KRS Chapter
> 13(B) can be construed as conferring upon the Department of
> Labor exclusive jurisdiction to resolve all disputes pertaining to
> nonpayment of salary or wages.

<u>Parts Depot</u>, 170 S.W.3d at 361-62 (citations omitted).

From the above language, England concludes that no longer is the Department of

Labor granted primary or exclusive jurisdiction to resolve disputes over whether an employer

has violated the provisions of the Kentucky Wages and Hours Act.  An employee who believes

that he or she is the victim of a violation of the Act may now, after <u>Parts Depot</u>, proceed directly

to assert his or her claims in state circuit court without any requirement to administratively

proceed before the Department.  Consequently, England reasons that a disappointed employee

who claims to have been denied lunch and rest breaks may bring his or her claim for violation of

KRS 337.355 and/or KRS 337.365 directly in circuit court while relying on KRS 446.070 to

support a private cause of action for the violation of either of the two statutes - - a result directly

at odds with the <u>Thompson</u> decision, a decision that England reiterates is no longer good law.

Several important points bear mention when this Court considers England's

interpretation of the scope and impact of <u>Parts Depot</u>.  First, as England implicitly concedes,

<u>Parts Depot</u> did not involve a claim for the denial of lunch or rest breaks in violation of KRS

28

337.355 or 337.365.  Parts Depot involved only a claim for unpaid salary or wages.  In fact, the

Kentucky Supreme Court directly cautions in footnote 3 of Parts Depot that:

> We only decide that KRS 337.385(1) authorizes the employee, or
> the Commissioner on behalf of the employee, to bring an action in
> circuit or district court against the employer for unpaid salary or
> wages.

Parts Depot, 170 S.W.3d at 358 n.3.  Thus, the decision is limited in the scope of its holding to

claims for unpaid salary or wages.

Second, the Kentucky Supreme Court in Parts Depot makes no effort to discuss

the existence or nonexistence of a private cause of action, as opposed to the authority of the state

courts of general jurisdiction to hear wage and hour claims relating to unpaid monetary

compensation in the first instance.  Indeed, from the very outset of the Parts Depot decision, its

author, Justice Cooper, sets out the nature of the inquiry at hand as follows:

> We have consolidated these two appeals because they present a
> common issue, *viz*: does a circuit court have original subject matter
> jurisdiction over a wage and hour dispute between an employer
> and employee, or is original jurisdiction over all such disputes
> vested exclusively in the Department of Labor by KRS Chapters
> 336 and 337, subject to only appellate review by the court of
> justice after exhaustion of administrative remedies?

Parts Depot, 170 S.W.3d at 335-36.

The nature of the inquiry in Parts Depot, therefore, was whether subject matter

jurisdiction existed in the court system in the first instance to hear claims brought pursuant to

KRS 337.385(1) for unpaid wages and overtime.  Nothing in the decision analyzed whether a

private cause of action personal to an aggrieved employee exists for the violation of his or her

statutory right to lunch and rest breaks.  Indeed, no decision that has discussed, or that has even

mentioned, Parts Depot since the decision was rendered in 2005, has ever interpreted it as

29

anything other than an inquiry into the subject matter jurisdiction of the state's circuit courts.

For example, the Sixth Circuit in <u>Oaks v. 3M Co.</u>, 453 F.3d 781, 782-83 (6th Cir. 2006) describes the gravamen of the decision thusly:

> <u>Parts Depot</u> settles the issue of whether the [federal] district court erred in determining it lacked jurisdiction to hear Oaks' statutory wage claim pursuant to Kentucky Revised Statute [Chapter] 337. <u>Parts Depot</u> held that Section 337.385(1) "unambiguously authorizes an uncompensated or undercompensated employee to sue the employer in 'any court of competent jurisdiction' for the amount due and unpaid, plus liquidated damages, costs, and attorney's fees."  170 S.W.3d at 358.  <u>Parts Depot</u> held that a plaintiff may file a wage claim in district court.  Accordingly, the district court here erred in concluding that it lacked jurisdiction to hear Oaks' KRS [Chapter] 337 claim.

<u>Id</u>.  Consequently, the only published federal appellate decision in this circuit to summarize the scope of <u>Parts Depot</u> describes the holding of the case in terms of subject matter jurisdiction rather than as a holding that creates a private right of action for the recovery of monetary damages arising from missed lunch and rest breaks.

Several federal district court cases also characterize the holding of <u>Parts Depot</u> in a manner similar to that of the <u>Oaks</u> decision.  Most recently in <u>Bowman v. Builder's Cabinet Supply Co.</u>, Case No. 04-201-BLB, 2006 WL 2460817 at *9 (E.D. Ky. Aug. 23, 2006), the District Court for the Eastern District of Kentucky rejected the argument of a defendant employer that a Kentucky plaintiff employee was required to exhaust her administrative remedies before she could proceed to court to bring her claim for unpaid wages and overtime compensation.  In so doing, the district court cited with approval the <u>Oaks</u> decision, explaining that in <u>Oaks</u>, "the Sixth Circuit reversed [the district court], noting that <u>Parts Depot</u> resolved the issue of whether a trial court possesses 'original subject matter jurisdiction over a wage and hour

30

dispute between an employer and employee,' in the affirmative." <u>Bowman</u>, 2006 WL 2460817

at *9.

   Likewise, the District Court for the Western District of Kentucky in <u>Davis v.</u>

<u>Siemens Medical Solutions USA, Inc.</u>, 399 F. Supp.2d 785, 802 n.12 (W.D. Ky. 2005), <u>aff'd</u>,

279 Fed. Appx. 378 (6th Cir. 2008), <u>cert. denied</u>, 129 S. Ct. 1318 (2009) described the holding of

<u>Parts Depot</u> with the following language:

> Recently, the Kentucky Supreme Court ruled that Kentucky courts
> do have subject matter jurisdiction regardless of whether the
> plaintiff has exhausted his remedies before the Labor Cabinet.

<u>Id</u>. (citing <u>Parts Depot</u>, 170 S.W.3d at 362).  As before, no mention is made of the creation or

acknowledgment in <u>Parts Depot</u> of any private cause of action for missed lunch or rest breaks.

   The few secondary legal sources that mention the <u>Parts Depot</u> decision also echo

this same theme - - that the decision is directed to the subject matter jurisdiction of the state

courts to address employee claims for unpaid wages under KRS 337.385(1), rather than by way

of administrative appeal as previously held under KRS 337.310(1).  For example, the Kentucky

Practice Series in the section devoted to subject matter jurisdiction explains <u>Parts Depot</u> to hold

that "whenever an employee, or the Commission on an employee's behalf, brings action against

employer to recover unpaid salary or wages, the specific statute applicable to the employer's

liability for unpaid wages, which confers original subject matter jurisdiction upon circuit or

district courts, takes precedence over the general statute applicable to all wage and hour disputes,

which confers original jurisdiction exclusively in the Department of Labor."  22 Kentucky

Practice<u>, Summary Judgment & Related Termination Motions</u>, § 2:6 (2009).  The American Law

Institute of the American Bar Association section on continuing legal education in its 2008

31

summary of state employment law developments, similarly explained that in <u>Parts Depot</u>

> [T]he Kentucky Supreme Court held that the trial courts have
> original jurisdiction over wage and hour disputes under the
> Kentucky state statute, and the court held that an employment
> policy may grant contractual rights to employees.

Robert B. Fitzpatrick, <u>State Employment Law Developments</u>, SP024 ALI-ABA 1775, 1805-06

(2008) (citing <u>Oaks v. 3M Co.</u>).

      In sum, none of the cases or other legal authorities cited above make any

reference to <u>Parts Depot</u> in the context of a claim for missed lunches or rest breaks or as creating

a private cause of action for such a claim.  Even the recent Supreme Court of Kentucky decision

in <u>Toyota Motor Manuf., Ky, Inc. v. Johnson</u>, __ S.W.3d __, 2009 WL 375835 at *1 (Ky. March

19, 2009) (non-final decision) summarizes <u>Parts Depot</u> in a fashion that echoes the views set

forth above.  In the words of the Supreme Court of Kentucky:

> In 2005, this court issued an opinion in <u>Parts Depot, Inc. v.
> Beiswenger</u>, 170 S.W.3d 354 (Ky. 2005), holding that circuit
> courts have parallel jurisdiction over wage and hour claims under
> KRS Chapter 337.  This decision did not deprive the KDOL of
> administrative jurisdiction, but merely held that the courts provide
> an alternative forum.  Thus, under <u>Parts Depot</u>, plaintiff may
> choose whether to proceed in the circuit court or before the
> Department of Labor when pursuing wage and hour disputes.

<u>Id</u>.

      In other words, <u>Parts Depot</u> runs directly to the authority of the state's circuit

courts to hear wage and hour claims in the first instance.  The decision is silent on whether

aggrieved employees have any private statutory right of action for missed lunches and rest

periods.  Indeed, one may infer from reading the legislative history of the statutory protection for

such lunch and rest breaks set forth in <u>Parts Depot</u> that no private right of action has ever been

statutorily recognized in KRS Chapter 337 or its statutory predecessors.

The most that England can offer on this point is the observation that KRS Chapter 337 does not expressly prohibit such a private right of action. In this respect, the Court agrees with England. Nowhere in KRS Chapter 337 does the legislature provide that employees are *forbidden* to pursue a private claim for missed lunch and rest breaks. To say that a matter is not specifically forbidden, however, is not the same as saying that such a matter is tacitly permitted. Any cause of action for missed lunches or rest breaks must find its origin either in the Kentucky Constitution or the statutes of the state; and failing such authorization, no inherent authority exists for this Court to judicially create such a claim from whole cloth.

The only remaining potential source for such a cause of action is KRS 446.070, which England relies on in the absence of any statutory source in KRS Chapter 337. This statute, enacted in 1942, exists to provide a private remedy to those individuals injured by another's violation of a state statute that either is penal in nature, or a statute that otherwise provides no private remedy for its enforcement for violation. See Thompson v. Breeding, 351 F.3d 732, 736 (6th Cir. 2003) ("Section 446.070 'was passed to remove any doubt that might arise as to the right of a person for whose protection the statute was passed to recover for a violation of that statute where the statute was penal in its nature, or where by its terms the statute did not prescribe a remedy for its enforcement or violation.'") (citing Hackney v. Fordson Coal Co., 19 S.W.2d 989, 990 (1929)). See also Ezell v. Christian County, 245 F.3d 853, 856 (6th Cir. 2001); Maiden v. North American Stainless, L.P., Appeal No. 03-5740, 2004 WL 2889919 at *3 (6th Cir. Dec. 15, 2004).

If the violated state statute, however, not only establishes the unlawful act that led

33

to the aggrieved party's injury, but also specifies a civil remedy available to the aggrieved party, then Kentucky law uniformly holds that the aggrieved party will be limited to the remedy provided by the statute.  Grzyb, 700 S.W.2d at 401 ("When the statute both declares the unlawful act and specifies the civil remedy available to the aggrieved party, the aggrieved party is limited to the remedy provided by the statute.").  In such situations, the aggrieved party may not successfully sue under KRS 446.070.  Thompson, 351 F.3d at 736 (citing Grzyb, 700 S.W.2d at 401).  See also State Farm Mut. Auto Ins. Co. v. Reeder, 763 S.W.2d 116, 117-18 (Ky. 1988) (Where the Unfair Claims Settlement Practices Act codified at KRS 304.12-230 failed to provide a remedy in damages for the violation of the act, a person who alleges injury as the result of unfair settlement claims practices may maintain an action in damages against the defendant insurer pursuant to KRS 446.070).

One might initially assume from reading Thompson v. Kosair Children's Hosp., 2000 WL 34248864 at *4 that the question of whether a private right of action may be maintained under KRS 446.070 for the denial of lunch and rest breaks has been finally put to rest. The Thompson decision does hold that because KRS 337.990 specifies "civil penalties" for violation of the provisions of KRS 337, that KRS 446.070 is not applicable and that an aggrieved party must look only to KRS Chapter 337 for his or her remedies.

The problem with such reasoning in Thompson is that it ignores the fundamental distinction between "penalties" and "remedies."  The penalty statute, KRS 337.990, is just that - - a statute enacted to impose a punishment upon employers who violate the protections statutorily created by KRS Chapter 337.  Nowhere in the fourteen subsections of KRS 337.990 (Michie 2007) is there any provision for an aggrieved employee to personally recover damages

34

for an employer's violation of the Kentucky Wages and Hours Act.  In fact, only subsection (10) contains any language that refers to either of the two critical statutes involving lunch and rest breaks.  Subsection (10) of KRS 337.990 imposes a civil penalty of not less than $100 nor more than $1,000 on any employer that violates the rest break provisions of KRS 337.365. Nowhere in subsection (10), or in any other subsection of KRS 337.990, is any "remedy" created for those unfortunate employees who are denied their lunch or rest breaks.

To the extent that the Thompson decision holds otherwise, the decision ignores the very essence of KRS 446.070, which was enacted specifically so that the mere existence of a statutory penalty will not bar an individual's right to private recovery of damages.  Certainly, KRS Chapter 337 contains numerous penalties, and indeed, some private remedies as in the case of unpaid wages and overtime.  See KRS 337.385(1).  The Chapter, however, contains absolutely no private remedies for aggrieved individuals who are injured by the wrongful denial of their lunch and rest breaks in violation of KRS 337.355 and 337.365.  The Thompson decision, therefore, is not sound authority to deny England a private cause of action in this regard.

This conclusion is supported in part by the Sixth Circuit decision of Ezell v. Christian County, Kentucky, 245 F.3d 853, 855-56 (6th Cir. 2000) wherein the estate of a deceased Kentucky driver brought suit against the defendant county and its county engineer, alleging that the defendants had violated the Kentucky statute, KRS 179.070, a state statute that imposes a duty on county engineers in Kentucky to "remove trees and other obstacles from the right-of-way" to prevent a "hazard to traffic."  Id. at 855.  The decedent's estate in Ezell alleged that as a result of the defendants' violation of KRS 179.070, the estate had a private cause of action against the county and county engineer by operation of KRS 446.070, an argument similar

35

to the argument now made by England.

        After examining KRS 179.070, and finding little indication of a private right of

action under that statute, the Sixth Circuit held that the plain language of KRS 446.070 created a

private right of action for the decedent's estate.  In so doing, the court explained that

> KRS § 179.070 does prescribe a remedy for its enforcement
> through a penalty to be paid by the county engineer into the county
> road fund, but it does not provide a remedy for those individuals
> intended to benefit from KRS § 179.070 - - individuals driving the
> roads of Kentucky.  Applying the rule in <u>Grzyb</u> and <u>Reeder</u> to the
> present case, we hold that KRS § 446.070 allows plaintiff to
> pursue his action because the $100 penalty prescribed in KRS §
> 179.990 does not give a remedy **to the aggrieved party** - -
> plaintiff David Ezell on behalf of his deceased brother's estate - -
> and plaintiff seems to be within the class of persons KRS §
> 179.070 was intended to protect.

<u>Ezell</u>, 245 F.3d at 856 (original emphasis) (footnote omitted).

        The same is true here.  England falls readily within the class of individuals

intended to benefit by operation of KRS 337.355 and 337.365 (Michie 2007).  Yet, the penalty

provisions of KRS 337.990, do not give England, as an aggrieved party, a remedy in damages.

They instead only impose a potential civil penalty upon his employer for its violation of the

provisions of KRS 337.365 (Michie 2007).  Therefore, England's situation, unlike that of other

potential plaintiffs who are afforded civil remedies by the statutes under review, falls into the

same category as that of <u>Ezell</u>.  <u>Cf</u>. <u>Thompson v. Breeding</u>, 351 F.3d 732, 736-37 (6th Cir. 2004)

(Real estate purchaser who brought civil action against auctioneer for the alleged violation of

KRS 330.110(10), (11) had no private right of action by operation of KRS 446.070 where KRS

Chapter 330 provided that the auctioneer's board is authorized to pay damages to aggrieved

individuals should the accused auctioneer fail to do so); <u>Maiden v. North American Stainless,</u>

L.P., 240 WL 2889919 at *4-5 (Former employee who alleged wrongful discharge by his employer in retaliation for bringing OSHA charges before the Kentucky Labor Cabinet had no private right of action arising from the violation of the statute prohibiting retaliatory discharge, KRS § 338.121(3)(b), where the same statute provided that on review the Labor Commissioner may order all appropriate relief which includes compensatory and punitive damages).

In sum, KRS Chapter 337, in and of itself, establishes no private cause of action for employees who are injured by the violation of KRS 337.355 or KRS 337.365.  Because the Chapter at most imposes only a civil penalty on employers shown to have violated these two statutes, a plaintiff employee injured by their violation has a private cause of action to recover damages by operation of KRS 446.070.[5]  Accordingly, England may proceed on his personal claim for damages arising from the denial of lunch and rest breaks.

The Court's conclusion that such a private right of action does exist does not resolve the related question of the type and amount of damages that would be recoverable for such a claim.  England seeks both compensatory and punitive damages.  In the latter regard, assessment of punitive damages in Kentucky is governed by KRS 411.186 (Michie 2007).  By statute, punitive damages are those exemplary damages, other than compensatory or nominal damages, that are awarded against a party to punish and to discourage that party from the commission of similar misconduct in the future.  See KRS 411.184(1)(f) (Michie 2007).  A plaintiff may only recover punitive damages based on a showing by clear and convincing

---

[5]  The Court is well aware that no published or unpublished decision of any Kentucky appellate court has reached this specific holding.  Nevertheless, the soundness of this result is confirmed by the reasoning of the various decisions discussed in the body of this recommendation.  Should either party desire to certify this legal issue to the Supreme Court of Kentucky, as earlier requested by Plaintiff England, the Court shall timely entertain such motion.

evidence that the defendant acted toward the plaintiff with oppression, fraud or malice as defined by statute KRS 411.184(2) (Michie 3007).

The terms "oppression," "fraud," and "malice," are statutorily defined with oppression being conduct intended to subject a plaintiff to cruel and unjust hardship.  In contrast, fraud is defined to be intentional misrepresentation, deceit or concealment of material fact that is known to the defendant and is concealed with the intention of causing injury to the plaintiff. Finally, malice is statutorily defined to be conduct intended by the defendant to cause injury to the plaintiff that is carried out by the defendant with a flagrant indifference to the rights of the plaintiff, as well as a subjective awareness that this conduct will result in either death or bodily harm.  See KRS 411.184(1)(a)-(c) (Michie 2007).[6]

When one considers the elements necessary for an award of punitive damages in the context of the present case, there is little basis on which England can successfully bring a personal claim for punitive damages, given the evidence presently of record in the case. The Court has read the deposition of England in its entirety along with the other materials submitted in support of and in opposition to Advance Auto's motion for summary judgment.  None of these materials contains any factual basis upon which a reasonable juror could infer that Advance Auto, or any of its agents, acted with fraud, malice or oppression toward the named Plaintiff in this case.  At most, we know only that England was trained by his store manager to clock out earlier in the store closing procedures than the company's written store closing procedures

---

[6]  The statutory definition of "malice" found in KRS 411.184(1)(c) has been held by the Supreme Court of Kentucky in Williams v. Wilson, 972 S.W.2d 260 (Ky. 1998) to be unconstitutional as being too restrictive a definition under the jural rights doctrine.  This holding does not affect the analysis of the Court in this matter, however, as explained above in the body of the recommendation.

required.  There is simply no inferences that can be drawn from this fact which in the present

circumstances would support an award for punitive damages.  Thus, while such a right to bring a

claim for punitive damages may exist, even though such damages are not mentioned in KRS

Chapter 337, the factual circumstances of the case, even when read in a light most favorable to

England, do not remotely support an award of punitive damages against the Defendant.


**d.**      **Claims for Unpaid Work "Off-the-Clock."**

The next issue centers on England's claim that on some 81 occasions during the

approximately ten months he was employed as first assistant manager he was unlawfully

required to work off-the-clock for approximately ten minutes on each occasion when he closed

the store at the end of the day.  England has calculated that this alleged off-the-clock work

amounts to some $194.94 in lost wages.

Advance Auto concedes that KRS 337.385 does provide a private cause of action

for unpaid wages and overtime compensation.  The company, however, denies it required

England to perform any work-related duties after clocking out during the store closing

procedures.  In fact, the company's written policy expressly required that employees be paid for

*all* time worked.  The company's standard operating procedures for closing the store, which

England was unfamiliar with, did not require the employees to clock out until the final steps in

the store closing process, immediately prior to printing out the daily report, turning out the lights

and locking the front door upon leaving.

Turning to federal case law arising under the Fair Labor Standards Act (FLSA),

Advance Auto first maintains that England cannot establish that he did actually work off-the-

clock in view of the existence of the company's written store policies prohibiting off-the-clock work combined with the failure of England to meaningfully report uncompensated work, or as first assistant manager of Store 8520 make the time entry corrections to ensure that store employees were fully paid for all time worked.

Advance Auto relies heavily on the case of <u>Seever v. Carrols Corp.</u>, 528 F.Supp.2d 159 (W.D. N.Y. 2007), which it maintains requires a plaintiff in England's circumstances to prove specific facts that establish when and how long he or she worked off-the-clock where the plaintiff never previously reported such work to his or her employer and any inaccuracies in the time records were due to the failure of the plaintiff to ensure that the records accurately reported the entire amount of time worked.  <u>Seever</u>, 528 F. Supp.2d at 170.

In effect, Advance Auto argues that any possible off-the-clock work that occurred was directly the result of England's own failure to familiarize himself with the company's employee handbook and online training materials, both of which clearly indicated that off-the-clock work is prohibited and that clocking out is not required at the earlier stage of the daily closing process at which England believed he was required to do.  Because he violated company policy, failed to familiarize himself with the proper closing procedures and then made no effort to exercise his authority to correct the alleged inaccuracies in his own or his employees' computerized time records, Advance Auto maintains that under <u>Seever</u> England bears a heightened burden of proof to avoid summary judgment.  He has entirely failed to satisfy this heightened burden, according to Advance Auto, by his complete reliance only on his own vague recollections and estimates as to the number of times that he worked off-the-clock and the amount of uncompensated time on each occasion.

Assuming that England did work off-the-clock, Advance Auto continues to argue that when one looks to the alleged amount of time involved on each occasion, it quickly becomes clear that England's claim is a *de minimis* one for which the courts will afford no remedy.  Even England's own testimony, which was at best conclusory, reveals that he believes that he worked approximately ten minutes on each of the 81 occasions that he alleges he had to clock out prior to completing the store closing process as he was trained to do it by his store manager.

Advance Auto insists that as a matter of law the federal courts routinely have held that amounts of uncompensated time of ten minutes or less are of such minor nature that the courts will not afford a remedy under the FLSA for them.  Advance Auto in this regard relies on Hesseltine v. Good year Tire & Rubber Co., 391 F. Supp.2d 509, 518-19 (E.D. Tex. 2005) ("A review of reported decisions reveals that courts consider daily periods of approximately ten minutes to be *de minimis* as a matter of law.") (citing Anderson v. Pilgrim's Pride Corp., 147 F. Supp.2d 556, 564 (E.D. Tex. 2001)).

England responds to these arguments by observing that Advance Auto has seized on the wrong law in grasping at the FLSA to try to persuade the Court that no genuine issues of material fact preclude the entry of summary judgment.  The proper focus, according to England, is not the FLSA, but simply KRS 337.385(1), which unambiguously provides a remedy to all hourly wage employees when an employer promotes uncompensated work off-the-clock.  Alternatively, England insists that even if the FLSA case law is somehow appropriate to analyze his claim for unpaid wages, Advance Auto was made well aware by the provisions of its own daily store closing SOP that certain work-related activities were required to be performed by its store employees after they clocked out.  Further, England directly advised Lynn Dudley, the

41

manager at Store 8520, of the improper practice of requiring store employees to clock out mid-

way through the daily store closing procedure.  Thus, Advance Auto had both constructive and

actual knowledge of off-the-clock uncompensated work being performed by its employees so

that the circumstances present in the Seever decision simply are not present in this case, even if

the FLSA were considered to set the proper standard for review of England's off-the-clock

claims.

England also challenges the application of the *de minimis* claim concept to actions

brought pursuant to KRS 337.385.  Nowhere in the statute or the Kentucky case law that

interprets it is there any support for the application of such a concept according to England.  In

fact, he maintains that such supposedly "*de minimis*" claims are exactly the type of small off-the-

clock work claims that are particularly suited to bring in a class action via Rule 23.  Further,

when one looks to all of the FLSA case law that discusses the *de minimis* defense, it is clear that

no bright line ten-minute rule exists to preclude recovery for uncompensated work.  In particular,

England cites several federal decisions that hold that no specific amount of time establishes any

bright line rule for when a small amount of uncompensated work is considered too minor to be

the basis for a claim.  See e.g. Reich v. Monofort, Inc., 144 F.3d 1329, 1333 (10th Cir. 1998).

England urges that it would be particularly unjust in the present case for a large

corporation such as Advance Auto to substantially and unlawfully reduce its labor costs by

promoting a *de facto* policy of off-the-clock work for thousands of hourly wage employees,

while at the same time coming before this Court to assert a *de minimus* defense under the FLSA.

If one were to aggregate the varying amounts of time related to these thousands of claims, the

result would be uncompensated, off-the-clock work that in no fashion could remotely be

42

characterized to be *de minimis*, England insists.  In fact, England points out that federal courts have granted relief on similar small claims that when considered in the aggregate, accumulated to substantial amounts of both time and money.  See Addison v. Huron Stevedoring Corp., 204 F.2d 88, 95 (2nd Cir. 1953).  Likewise, the factors ordinarily considered by the federal courts when faced with a *de minimis* defense in an FLSA action, irregularity of additional uncompensated work, practical administrative difficulty in recording the additional time and the regularity of such work, all fall in favor of the viability of his off-the-clock claim, rather than against it.

Finally, England adds that merely because Advance Auto hoped to manufacture a defense by mailing to him a check for $194.94 immediately prior to filing its motion for summary judgment does not extinguish his claim.  Advance Auto's check, as England points out, does not address the recovery of liquidated damages, costs and prejudgment interest, all of which are recoverable under KRS 337.385.  Accordingly, this last minute tactic by Advance Auto does not put an end to England's current claim for recovery of off-the-clock work in his view. Cf. O'Brien, et al v. Donnelly Entpr. Inc, ___F.3d ___, 2009 WL 2382437 at * 4-5 (6th Cir. Aug. 05, 2009)(discussing whether an employer's offer of judgment in a FLSA case for off-the-clock work rendered the plaintiff employee's claims moot).

The Court begins its analysis of these many arguments by referring initially to the law of Kentucky and the *de minimis* defense raised by Advance Auto.  Although England suggests that the *de minimis* defense is a creature of the FLSA, the Court notes that the principle of *de minimis non curat lex* has been recognized in the common law of Kentucky, albeit not in the context of KRS Chapter 337, for many years.

43

Literally, this Latin phrase is defined to mean that "the law does not care for, or take notice of, very small or trifling matters." Black's Law Dictionary, p. 388 (5th Ed. 1979). The underlying principle was first recognized in published Kentucky case law in Clark v. Mason, 95 S.W.2d 292, 296 (Ky. 1934). It is referred to in a number of early cases. See J.N. Youngblood Truck Lines v. Hatfield, 201 S.W.2d 567, 571-72 (Ky. 1947) (holding that an amount of $205 was "too large to be treated as trivial under the rule of *de minimis non curate lex*"); Munson v. White, 217 S.W.2d 641, 642 (Ky. 1949) (overcharge of $2.38 held to fall within the principle of *de minimis not curat lex* and would be ignored by the court). Thus, one cannot say with any persuasive force that Kentucky courts do not recognize the *de minimis* defense, or that the concept is somehow exclusive to federal law. It is not and the above cases confirm this to be so.

Referral to federal law to flesh out the *de minimis* defense in the context of wage and hour claims such as the present one does not appear to the Court to be contrary to the history, the development or the purpose of the Kentucky Wages and Hours Act. Indeed, the Supreme Court of Kentucky notes in Parts Depot that in certain respects Kentucky's law in this area is based upon the FLSA. Parts Depot, 170 S.W.3d at 358 (KRS 337.385 is substantially similar to 29 U.S.C. § 216(b) of the Fair Labor Standards Act, which also authorizes a private cause of action by an employee against an employer to recover damages, including liquidated damages and attorney's fees, for failure to pay wages owed for services rendered"). In the absence of any cited authority by England that expressly prohibits the consideration of FLSA case law in the context of a claim for unpaid wages or overtime under KRS 337.385, the Court concludes that reliance on the FLSA does no violence to the intent of the Kentucky Wages and

Hours Act.

The critical question is whether federal case law involving the *de minimis* defense, when applied to England's current claim for unpaid wages, requires this Court to conclude as a matter of law that his claim is so "trivial" that the federal courts will decline to address it. Federal case law sets forth a number of factors to be considered when determining whether the *de minimis* defense applies. These factors include: (1) the practical administrative difficulty of recording the additional uncompensated time; (2) the aggregate amount of compensable time; and (3) the regularity of the additional uncompensated work. Bobo v. United States, 136 F.3d 1465, 1468 (Fed. Cir. 1998) (citing Lindow v. United States, 738 F.2d 1057, 1063 (9th Cir. 1984)). Under these factors, claims for unpaid wages that involve infrequent occurrences of trivial amounts of time that are administratively impractical to measure will justify the determination that the courts simply will not be bothered with them.

The best flavor of this judicial attitude is found in the language of Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 692 (1946), wherein the Supreme Court explains:

> When the matter at issue concerns only a few seconds or minutes of work beyond the scheduled working hours, such trifles may be disregarded. Split-second absurdities are not justified by the actualities of working conditions or by the policy of the Fair Labor Standards Act. It is only when an employee is required to give up a substantial measure of his time and effort that compensable working time is involved.

Id. See also Adams v. United States, 65 F. Cl. 217, 221-22 (F. Cl. 2005), aff'd, 471 F.3d 1321 (Fed. Cir. 2006), cert. denied, 128 S. Ct. 866 (2008) (quoting Anderson).

Here, we are not faced with "split-second absurdities" so much as we are with England's own testimony that he routinely worked ten minutes off-the-clock on each of the 81

45

evenings that he closed the store.  This ten-minute time reference raises the question of whether some bright line rule exists that such amounts of time are trivial as a matter of law.  Certain federal decisions do undeniably suggest that the *de minimis* doctrine, by operation 5 C.F.R. § 551.412(a)(1), does apply to work periods of ten minutes or less per day.  See Eabby, 82 Fed. Cl. at 728 ("OPM limits the application of the *de minimis* doctrine to periods of ten minutes or less per day.").  See also E.I. duPont v. Harrup, 227 F.2d 133, 135 (4th Cir. 1955) (where the disputed work took less than ten minutes per day, application of the *de minimis* doctrine was held to be appropriate).

Examination of the Code of Federal Regulations at 5 C.F.R. §551.412(a)(1) seems to indicate that the federal Office of Personnel Management adopted some form of ten-minute rule.  Under the rule, preparatory or concluding activities that are closely related to an employee's principle work activities which exceed more than ten minutes per work day will be credited as hours of work.[7]  Such language notwithstanding, the Court hesitates to judicially draft a ten-minute *de minimis* rule into the Kentucky Wages and Hours Act based on the language of this federal administrative regulation, the cited cases, or even Anderson.

First, Anderson certainly establishes no bright line "ten-minute rule" which

---

[7] The language of the regulation specifically provides:

> (a)(1) If an agency reasonably determines that a preparatory or concluding activity is closely related to an employee's principle activities, and is indispensable to the performance or the principle activities, and that the total time spent in that activity is more than ten minutes per work day, the agency shall credit all of the time spent in that activity, including the ten minutes, as hours of work.

5 C.F.R. § 551.412(a)(1) (West 2009).

compels the courts, both federal and state, to disregard increments of uncompensated time of less than ten minutes.  Second, the undeniable existence of a multi-factor test, such as that of <u>Bobo</u>, of itself, implicitly suggests that bright line rules are to be avoided rather than promoted.  There would be little need to consider three separate factors in those cases involving time increments of less than ten minutes if a bright line rule compelled the courts as a matter of law to ignore increments of less than ten minutes.  Third, and finally, when one looks to the multi-factor test, it becomes readily apparent that these factors, while not all heavily weighing in favor of England, do on the whole support his view that the application of the *de minimis* defense to dismiss his claim for off-the-clock work would be ill-advised.

England maintains that he and the other store employees routinely were required to perform such off-the-clock work on a regular basis; thus, the factor of "regularity of additional work" falls in his favor.  Likewise, the "aggregate amount of compensable time" factor, certainly when viewed in the context of a class action involving potentially hundreds of employees, amounts to far more than a "trivial" matter.  One might wonder if the opposite conclusion were reached, whether such class actions for smaller claims of uncompensated off-the-clock work could ever be heard in federal court.  The very purpose of Rue 23 would be called directly into question if such a bright line test as that advocated by Advance Auto were adopted.  Finally, there is the "practical administrative difficulty of recording the additional time."  <u>Bobo</u>, 136 F.3d at 1468.

Assuming the truth of England's claim that Advance Auto workers are subject to a *de facto* policy of clocking out well before the conclusion of the end of day procedures, nothing is apparent on the face of the record that would prevent the uncompensated time from

47

being recorded.  Employees at store 8520 and at the other Advance Auto stores in the Plaintiff's division, and the state, could have had their uncompensated off-the-clock work recorded in the APAL system, as Advance Auto now maintains should have been done in the first instance, had not the supposed *de facto* policy of clocking out early been in place.  Thus, when one looks to all three of the factors routinely applied to determine whether an aggrieved employee's claim is *de minimis*, it is readily apparent that England's claim does not fit easily within this category.  For these reasons, the Court rejects the notion that his off-the-clock claim is too minor for our busy court system to take up.

This conclusion brings the Court to the question of whether, as a matter of law, England has failed to raise a genuine issue of material fact on an essential element of his off-the-clock wage claim based on the analysis of the <u>Seever</u> decision.  Advance Auto's significant reliance on <u>Seever</u> and FLSA case law requires the Court to briefly review both.  In <u>Seever</u>, several former employees of a mall fast food restaurant brought suit against the company that owned their franchise, along with some 349 other such franchises, alleging that their employer failed to pay them wages that they were legally entitled to under the FLSA. <u>Seever</u>, 528 F. Supp.2d at 162.  The ten plaintiff employees in <u>Seever</u> sought the conditional certification of an FLSA collective action and notice to a nationwide class estimated to be over 100,000 employees.  Part of the plaintiffs' claims included the allegation that the defendant employer, Carrols Corporation, had failed to compensate them for work performed off-the-clock, as well as time spent undergoing training and attending managers' meetings.  <u>Id</u>. at 162.

Discovery revealed that plaintiff twins, Dawn and Deborah Seever, were both assistant managers at their particular restaurant, Unit 416, where they were responsible to

48

oversee day-to-day operations. One of their regular tasks was the responsibility to maintain employee time records and to ensure that appropriate corrections were made to the records of the employees whose work shifts they supervised. Id. at 163.

Carrols had developed a number of SOPs requiring compliance with all federal and state laws related to wage and hour regulations. The company's training manual also required that its managers ensure that all employees under their supervision were properly paid for time worked, including overtime. Id. Included in the company's workplace policies found in its orientation handbook was a grievance procedure that set out a means by which employees could pursue formal written complaints with company management about any company policy or procedure. Id.

Both of the twins, Dawn and Deborah Seever, were assistant manager III employees. As such, they had authority to enter time sheet corrections to reflect actual hours worked, not only on their own time sheets, but on those of the employees they supervised. Id. at 164. In fact, one of the twins, Dawn Seever, admitted she was familiar with the company's written policy on payment for overtime and had reported off-the-clock work on her own time sheets, but inexplicably failed to compensate the employees that she supervised for certain of their own off-the-clock work. Dawn even acknowledged that she knew that her failure to record all of the time worked for the employees that she supervised violated the written wage and hour policies of the company. She nevertheless did so at the request of her restaurant manager, Tami Falkner. Id.

The Seever twins' employment history with the Carrol Corporation was checkered, to put the matter mildly. The Seever opinion reflects that both women were

reprimanded by their district supervisor for improperly assigning themselves excessive amounts of overtime to perform job-related tasks that should have been completed within their normal 40-hour workweek.  Further, the two women were believed to have been artificially inflating the number of hours that they reported to Carrol by entering certain "corrections" on their time sheets to falsely reflect earlier clock-in times and/or later clock-out times than they actually had. Id.  Despite the district supervisor's instruction to the Seever twins that they obtain his direct permission before working additional overtime, Dawn admitted in her deposition that she deliberately disobeyed his instructions and continued to unilaterally assign herself unauthorized overtime for which she received payment by the company.  Id. at 165.  During this series of events, she was placed on two-month probation due to the poor financial performance of the store and her poor attitude.

Amazingly, during this probationary period, both Seever twins continued to assign themselves unauthorized overtime even as their store failed economically.  Id. Consequently, the district director terminated both of the twin assistant managers on July 16, 2002.  Within ten days, the Seevers contacted the company demanding that they be paid certain "retroactive pay" for work that they had failed to report on their time sheets.  Although the company questioned the specific dates and times that the Seever twins alleged they had performed off-the-clock work, the company offered to pay them for any off-the-clock work that they could establish.  The Seevers did not respond to this request.  Instead, they, along with eight Carrol employees, filed suit against the company.  Id. at 165.

When faced with the claims of the ten plaintiffs for off-the-clock work for which they were not compensated, and which their defendant employer allegedly was unaware, the

district court in <u>Seever</u> observed that the group of plaintiffs' claims were

> supported solely by the testimony of the plaintiffs themselves,
> comprised largely of nebulous recollections of tasks each
> individual might have performed off-the-clock, which vary
> dramatically between the plaintiffs and are uncorroborated by any
> other evidence.

<u>Seever</u>, 528 F. Supp.2d at 169.  The <u>Seever</u> court then immediately continued in its opinion to go

plaintiff-by-plaintiff recounting each one's testimony concerning her experience with off-the-

clock work noting the vague and conflicting nature of each plaintiff's testimony taken as a

group.  After cataloging the inconsistent and vague nature of each plaintiff's testimony about

off-the-clock work in relation to that of each other plaintiff, the court in <u>Seever</u> concluded that

> based on the plaintiffs' inability to provide specific facts
> establishing when, and for how long, they performed the off-the-
> clock tasks for which they now seek compensation, the undisputed
> fact that plaintiffs never reported this work on their time sheets,
> and the fact that plaintiffs' allegations rest solely on their own bare
> recollections, plaintiffs cannot meet their ultimate burden to
> demonstrate that they performed work for Carrols about which
> Carrols was aware and for which they were not compensated.  As
> such, plaintiffs' claims with respect to uncompensated off-the-
> clock work must be dismissed.

<u>Id</u>. at 170.

The <u>Seever</u> court then continued to reject the plaintiffs' argument that they should

be held to a lesser burden under <u>Anderson v. Mt. Clemens Pottery Co.</u>, 328 U.S. 680, 686-87

(1946).  As the court described <u>Anderson</u>, the decision holds that when an employer has failed to

keep accurate or adequate time records, an employee may satisfy her burden to show that she

performed off-the-clock work if she produces evidence to generally show the amount and extent

of the uncompensated work "as a matter of just and reasonable inference."  <u>Anderson</u>, 328 U.S.

at 687-88.  This lesser burden, as the court noted in <u>Anderson</u>, may be satisfied by the sole

51

testimony of the complaining employee based on her recollection alone.  Id. at 170.

Should the employee satisfy this reduced standard to make her *prima facie* case, then under Anderson, the burden shifts to the employer to produce evidence to negate the reasonableness of the inference drawn from the evidence provided by the plaintiff employee.  Id. Should the defendant employer fail to produce evidence to rebut the employee's *prima facie* case, the court may award the plaintiff employee damages even if such damages must be approximated.  Id.  See gen. Harvill v. Westward Communications, LLC, 433 F.3d 428, 440-41 (5th Cir. 2005) (discussing the burden shifting approach of Anderson); Grochowski v. Phoenix Construction, 318 F.3d 80, 87-88 (2nd Cir. 2003) (same); Felker v. Southwestern Emergency Medical Service, Inc., 581 F. Supp.2d 1006, 1009-10 (S.D. Ind. 2008).

Because the Seever twins and the other plaintiffs had control over how their time records were maintained, and because they were paid exactly what such records presented, the court in Seever declined to apply the Anderson test which is founded on the *employer's* failure to keep accurate and adequate time records, rather than the refusal of its employees to do so.  In other words, the court held that "any inaccuracies in the Carrol's records are *solely due to the plaintiffs' deliberate failure to act and report the time they worked.*"  Id. at 170 (original emphasis).  To apply any favorable presumption concerning the burden of proof under such circumstances, according to Seever, would unfairly hand over to potential aggrieved employees such as the Plaintiffs, the power to manipulate their time records in order to obtain the benefit of the lesser Anderson standard with the result being that the employer's otherwise FLSA-compliant records become useless.  The defendant employer, based not on any action that the company took, is left defenseless in such case to refute the "recollection" of an aggrieved

52

plaintiff employee.  <u>Id</u>. at 171 (original quotation marks).

Seever noted that while the plaintiffs insisted that their store manager instructed

them not to record all of their time, this claim by some, but not all, of the ten plaintiffs was

immaterial.  The Seevers and the other manager plaintiffs, McHugh and Rodriguez, all had the

authority to make time corrections to accurately reflect the amount of their work.  Yet, they

admitted that they often did not do so.  Faced with these unique circumstances, the district court

concluded in <u>Seever</u> that the defendant employer had produced sufficient evidence to negate the

inference that the plaintiff employees had performed work off-the-clock.

The inference was negated by (1) the establishment of Carrols' written policies,

(2) the training materials that uniformly instructed that all time worked by employees was to be

compensated, along with (3) the company's employee time records, which the court found to be

in compliance with FLSA standards and state law.  The court also noted the plaintiff employees'

testimony of their knowledge that it was the company's policy to pay for off-the-clock work.

Consequently, in light of these facts, the court in <u>Seever</u> concluded its analysis on the off-the-

clock claim by observing that even had the more relaxed <u>Anderson</u> test been applied, the Seever

sisters and the eight remaining plaintiffs could not as a matter of law rebut the showing made by

defendant Carrols that negated their "just and reasonable inference" that they had worked off-

the-clock without pay.  Consequently, the district court dismissed plaintiffs' off-the-clock claims

on Carrol's motion for summary judgment.

Advance Auto would now have this Court reach the same result based largely on

<u>Seever</u>.  After having now examined <u>Seever</u> in depth, the Court is unable to accept Advance

Auto's suggestion that <u>Seever</u> controls the outcome of England's off-the-clock claim.  For a

number of well-founded reasons, the Court finds such a suggestion to be suspect in the context of the present case.

   First, the Court cannot simply ignore the equitable considerations that played an oversized role in the outcome of the <u>Seever</u> case.  One has only to fully read the <u>Seever</u> opinion to appreciate the impact that the Seever twins' work-related misconduct had on the outcome. Indeed, the court in <u>Seever</u> went so far as to seriously consider the prospect of dismissing the plaintiffs' off-the-clock work claims as a matter of law based on the doctrine of equitable estoppel given the willful misrepresentations of the Seever twins to their former employer concerning their supposed hours of work.  <u>Seever</u>, 528 F. Supp.2d at 170-71, n.6.  In other words, the district court in <u>Seever</u> had such a low opinion of the credibility of the Seevers' testimony, and that of their co-plaintiffs, that the court came close to dismissing their claims by precluding them from relying on their own testimony as a matter of fairness under the unique circumstances of that case.

   Any doubt whatsoever about the court's opinion of the Seevers dissolves in the face of the following comment from the court.

> After reviewing all of the evidence, it appears that the Seevers, who, in part, occasioned this lawsuit, were nothing more than disgruntled former employees who were fired for serious breach of Carrols' policy and for falsifying their own time records.  Much of what occurred at the restaurant was their doing.

<u>Id</u>. 528 at 172.  The present lawsuit simply does not involve in any manner the type of fraudulent and inequitable conduct practiced by the twins against their employer in <u>Seever</u>.  If for no other reason, this discrepancy alone would cause the Court to be extraordinarily cautious in accepting Advance Auto's suggestions that <u>Seever</u> puts an end to England's off-the-clock claim.

Another significant factor in Seever that simply is not present in this case is the vague and inconsistent testimony among the ten co-plaintiffs themselves. The court in Seever highlighted the material inconsistencies, which this Court need not repeat in depth. Essentially, the plaintiffs in Seever could not agree on (1) whether the manager at their restaurant had instructed all of them to work off-the-clock, (2) whether they had done so and (3) on what occasion and to what extent. Given such circumstances, it is little wonder that the court in Seever ultimately concluded that the plaintiffs' testimony simply was not the basis of a "just and reasonable inference" regarding uncompensated work in light of the undisputed testimony of Carrols' published work policies requiring payment for all work performed, along with the ability, and indeed the duty, of certain of the aggrieved plaintiffs to correct any mistaken time entries.

It is true that the proof put forward by Advance Auto in this case does establish that its own written policies preclude off-the-clock work. Also, violation of this policy could result in termination. Likewise, England did have the ability to alter the electronic time entries not only for his own recorded time, but for that of the employees who worked under his supervision at Store 8520. To this extent, certain similarities between Seever and this case do exist. Yet, England's case possesses a number of strengths that the Seever twins simply could not muster.

Here, we are not faced with a situation where England cannot recall the occasions on which he worked off-the-clock at Store 8520. His testimony in this regard is consistent throughout. On virtually every occasion that England closed the store, he and all of the other employees working with him, clocked out of the APAL system immediately prior to England

entering the amount of cash in the store safe.  Accordingly, the remainder of that store closing

procedure was performed off-the-clock by England and all the other store employees apparently

based on England's belief that he could not electronically complete the store closing procedure

unless he and the others clocked out at that time.  Thus, the only potential uncertainty is the

amount of time that England and the others worked off-the-clock on the 81 occasions that he

closed Store 8520.

England estimates that he and the others worked off-the-clock for approximately

10 minutes on each such occasion.  Had he used the override function in the daily close APAL

computer program to delay clocking out until the near-end of the closing process, England

estimates the uncompensated time between clocking out and leaving the store would have been

approximately two-to-three minutes.  This relatively minor ambiguity in the exact amount of

uncompensated time worked entirely pales in comparison to the type of ambiguous and

internally inconsistent testimony of the plaintiffs in Seever.

The Court concludes that to dismiss England's own off-the-clock claim based on

Seever would not only be incorrect given the materially distinguishable facts of Seever, but also

would ignore the general principles arising under the FLSA case law on this issue, as well as

certain well-established principles relating to the entry of summary judgment.  In the broadest

sense, England's burden on his off-the-clock claim is merely to establish that he performed

compensable work for a number of hours for which he was not properly compensated by his

employer, who either did know or had reason to know that he was working off-the-clock.  Hertz,

566 F.3d at 783.  The burden in this regard falls directly on England.  Grochowski, 318 F.3d at

87-88.

In considering whether a plaintiff employee such as England has met his burden, the Court is required first of all to keep in mind the remedial nature of the wage and hour statutes involved and the public policy embodied therein.  Felker, 581 F. Supp.2d at 1009-10 (quoting Anderson, 328 U.S. at 686-87).  Merely because an employee may have difficulty in calculating the amount of damages, or that the amount may be uncertain, is not of itself an appropriate basis on which to entirely deny a right of recovery.  Walters v. American Coach Lines of Miami, 569 F. supp.2d 1270, 1300-01 (S.D. Fla. 2008), aff'd, __ F.3d __, 2009 WL 2182419 (11th Cir. Jul. 23, 2009).  As one federal case puts the matter, "This burden is not intended to be 'an impossible hurdle for the employee.'"  Kasten v. Saint Gobain Performance Plastics Corp., 556 F. Supp.2d 941, 952 (W.D. Wisc. 2008).

The testimony of the Plaintiff standing alone may itself be sufficient to meet the employee's burden.  Riverra v. Ndola Pharmacy Corp., 497 F. Supp.2d 381, 388 (E.D. N.Y. 2007).  While a baldly conclusory and self-serving affidavit devoid of any substantial detail may not be relied on, Gatto v. Mortgage Specialists of Ill, Inc., 442 F. Supp.2d 529, 534-37 (N.D. Ill. 2006), a plaintiff who alleges that he or she was not paid, but was forced to work off-the-cock, will avoid dismissal as a matter of law so long as the evidence put forward by the employee, including his or her own testimony, is a sufficient basis on which a reasonable juror could infer that the employee had performed work for his or her employer for which no compensation had been paid and the employer had reason to know of such circumstances.  Id.

Here, as a matter of well-established law, we must accept England' testimony as being true.  England testified that the store manager trained him that he must clock out all of the store employees through the APAL system prior to entering the amount of the cash on hand in

57

the safe.  England' testified that he repeatedly grumbled to the store manager about this requirement that forced him and the others work off-the-clock when closing the store.[8]  The fact that England did not complain higher up the chain, or that he did not go behind and manually correct the time records for himself and the other store employees are circumstances that do not work as a matter of law to deny England's right to recovery, but more naturally run to the question of mitigation and the extent of any possible recovery rather than the right to pursue it in the first instance.  Looking to all of the evidence, along with the FLSA case law cited herein, and the standard for summary judgment, the Court concludes that genuine issues of material fact preclude entry of summary judgment on behalf of Advance Auto on England's personal claim to recover for the off-the-clock work that he regularly performed as part of the store closing process at Store 8520.

The Court has a much more difficult problem, however, concluding that genuine issues of material fact exist as to whether a state-wide or a division-wide *de facto* policy was implemented by Advance Auto to have its employees work off-the-clock while closing its Kentucky stores.  England is the sole individual who testified as to the existence of such a *de facto* policy.  His testimony rests exclusively on his experience at Store 8520, along with the one day that he spent at the Advance Auto sister store located in Russell Springs, Kentucky.  From this, and only this, experience, England testified that he has formed the "belief" that a *de facto* policy existed in Kentucky of requiring off-the-clock work at all of the involved Advance Auto stores.

---

[8]  The store manager has supplied his affidavit in which he recollects no such complaints. This suggests the existence of the genuine issue of material fact surrounding this aspect of England's case.

At the most fundamental level, a belief is merely an opinion based on observed or related facts.  England's own observations were of the most limited nature and were essentially confined to his experiences at one store.  The Court has great difficulty in seeing how a reasonable juror could reasonably infer, based on such highly limited experience, that a statewide policy existed that would serve as a basis for a class recovery in this case.

In other words, England's belief in the existence of the *de facto* off-the-clock store closing policy is not an inference that a reasonable juror would make even when all of the facts known to England are accepted as being true for the purpose of this motion.  So, while the Court has little difficulty rejecting the dismissal of England's personal claim to recover unpaid off-the-clock wages, it is far less confident that the facts as presently developed through discovery, including the extended period granted for additional discovery, establish a genuine issue of material fact as to the existence of a statewide *de facto* company policy that unlawfully required off-the-clock work for all Advance Auto employees, England's belief to the contrary notwithstanding.  This concern of the Court, however, does not turn the issue of England's class claims.  As discussed below, a separate reason compels the Court to deny class action status in this case.

**The Class Action Claims Under Rule 23.**

England has filed his complaint as a putative class action.  No current motion for conditional class certification, however, is before the Court.  Instead, Advance Auto argues in its motion for summary judgment that England's class claims should be stricken as a matter of law under Rule 23(a) of the Federal Rules of Civil Procedure for two primary reasons.  First,

according to Advance Auto, common issues among the proposed employee plaintiffs do not predominate in this lawsuit so as to make it appropriate for class treatment.  Second, Advance Auto argues that England simply is not an adequate representative for the proposed class, given his managerial employment status, which makes him a potential adverse party to the members of the very class that he now proposes.  His failure to perform his managerial duty to prevent the off-the-clock work for which the proposed class seeks recovery may render England liable to certain members of the class he now seeks to represent.

Advance Auto acknowledges in its motion for summary judgment that England has not yet moved for certification of his proposed class.  Any such certification, according to Advance Auto, would be clearly contrary to the well-established requirements of Rule 23 as a matter of law.  On this point, the company maintains that because it has established by undisputed evidence, a written company-wide policy that requires (1) compliance with both federal and state wage and hour laws, and (2) payment for all time worked, England will have to prove his alleged statewide *de facto* policy of promoting off-the-clock work and the denial of meal and rest breaks on a store-by-store basis for each of the 86 Kentucky stores and its employees.  In the words of Advance Auto, "Essentially, each class member would have to establish that his or her store managers departed from company policies and failed to pay him or her for all time worked at closing time...."  (DN 53, p. 7).

The same individual inquiry will be necessary to determine whether those employees at the other stores were scheduled meal and rest breaks and permitted to take them on what occasions.  Given this lack of commonality and the almost infinite variety of individual experiences with off-the-clock work, meal and rest breaks, Advance  Auto concludes that a clear

60

lack of commonality precludes the treatment of the present lawsuit as a class action.  See Noonan v. Indiana Gamin Co., LP, 217 F.R.D. 392, 396-97 (E.D. Ky. 2003).

Advance Auto adds that England's status as first assistant manager gives rise to an inherent conflict of interest with the claims of the non-managerial employee members of his proposed class.  Advance Auto argues, based on White v. Asmose, Inc., 204 F. Supp.2d 1309 (N.D. Ala. 2002), that England is not similarly situated with the non-managerial members of his proposed class.  In fact, he suffers from an unavoidable conflict of interest arising from his managerial duty to accurately report and correct the time worked by those employees under his supervision.  Accordingly, Advance Auto insists that England as assistant manager of Store 8520 stands in the exact same position as the plaintiff foreman in the White decision.

England in his response to these arguments maintains that Advance Auto's class-related arguments overlook much of the documentary evidence provided to date in the action. These wage and hour records uniformly show that all of the hourly wage employees for whom records were supplied were denied meal and rest breaks.  They are powerful evidence of common claims among the proposed class members and indeed are afforded a presumption of reliability, according to England.  Salvas v. Wal-Mart Stores, Inc., 893 N.E.2d 1187, 1205-07 (Mass. 2008).

England argues along the same lines that his testimony establishes a common requirement that all hourly wage employees were required to work off-the-clock during the store closing procedures at Store 8520 and at the Russell Springs store.  He further points out that the requirement of commonality under Rule 23 does not require that *every* question of law or of fact be common to *every* class member.  Dukes v. Wal-Mart Stores, Inc., 222 F.R.D. 137, 145 (N.D.

Cal. 2004).  So long as a single common issue relates the members of the class, the existence of accompanying individual issues will not preclude certification.

As for the adequacy of his representation, England counters that his mere status as former first assistant manager does not create any insurmountable conflict of interest or the potential for conflict between himself and the other member of the proposed employee class. The time-shaving that he alleges, according to England, applied both to hourly wage supervisors and non-supervisors alike, so that both types of employees can comfortably fit within the same proposed class.  Barton v. Albertson's, Inc., 1998 U.S. Dist. LEXIS 7665 at p. 7 (D. Idaho 1998) (quoting 5 Newberg on Class Actions, § 24.42 at pp. 24-71 to 24-171 Third Ed. 1992)).  See also Krueger v. New York Telephone Co., 163 F.R.D. 433, 443 (S.D.N.Y. 1995) (Supervisors and non-supervisors of a plaintiff class of employees alleging employment discrimination did not have an inherent conflict of interest that precluded certification in a class action).

England maintains that the circumstances of the Barton case are directly analogous to the circumstances of his case.  Both cases involve claims of time-shaving brought against a chain of retail stores that promoted off-the-clock work for their hourly wage employees.  In Barton, according to England, the court rejected the same type of inherent conflict of interest argument that Advance Auto now seizes upon to try to avoid its responsibilities under the Kentucky Wages and Hours Act.  Barton rejected such an argument and England now asks this Court to do so as well.

Before the Court resolves these various arguments of the parties, the general principles of law that govern Rule 23 must be reviewed so that the framework for proper analysis may be established.  In this circuit the federal district courts are vested broad discretion in

deciding whether a particular suit properly may be maintained as a class action.  Kentucky

Educators Public Affairs Council v. Kentucky Registry of Election Finance, 677 F.2d 1125, 1135

(6th Cir. 1982) (citing Ott v. Speedwriting Publishing Co., 518 F.2d 1143 (6th Cir. 1975)).  Under

Rule 23, the burden logically falls on the party that seeks to use the Rule to bring a class action

suit to establish his or her right to do so.  Senter v. General Motors Corp., 532 F.3d 511, 522-23

n. 22 (6th Cir. 1976), cert. denied, 429 U.S. 870 (1976).

This burden initially requires the Plaintiff to satisfy the four prerequisites found in

Rule 23(a), after which Plaintiff must then persuade the Court that the class of individuals he

seeks to represent falls within one of the three subcategories of Rule 23(b).  Id.  The mere

designation of an action as being a class action in the pleadings of the party seeking certification

is *not* sufficient to meet this burden, nor is it adequate merely to repeat the language of Rule

23(a).  Weathers v. Peters Realty Corp., 499 F.2d 1197, 1199-1201 (6th Cir. 1974).  Instead, the

party who seeks class action status must come forward with basic facts sufficient to show that

each requirement of the rule has been satisfied, a determination that ordinarily may not be

predicated merely upon the facts alleged in the pleadings.  Id. (citing Huff v. ND Cass Co. of

Alabama, 485 F.2d 710 (5th Cir. 1973)).

All of the four prerequisites contained in subsection (a) of Rule 23 must be

satisfied.  Senter, 532 F.2d at 522 n.22.  These prerequisites are often referred to as being

"prerequisites of numerosity, commonality, typicality, and adequacy of representation."  General

Telephone Co. of Southwest v. Falcon, 457 U.S. 147, 156 (1982); Batsakas v. Fed. Deposit Ins.

Corp., 670 F. Supp. 749, 757 (W.D. Mich. 1987) (discussing the prerequisites of Rule 23(a));

Meyers v. Ace Hardware, Inc., 95 F.R.D. 145, 149-52 (N.D. Ohio 1982) (same).

Here, no dispute exists over the prerequisite of numerosity found in Rule 23(a)(1). This prerequisite requires only that a class be so numerous that joinder of all members is impractical. Id. No strict quantitative test exists to determine the impractibility of joinder and no automatic cutoff point has been established which makes joinder of a number of plaintiffs impractical. In re American Medical Systems, Inc., 75 F.3d 1069, 1079 (6th Cir. 1996). In this instance, England seeks to establish a class that includes the hourly wage employees of all 86 Kentucky Advance Auto stores, each of which has its own store employees. The result is that the potential number of class members easily reaches into the hundreds, perhaps even thousands. Advance Auto in its motion for summary judgment does not focus on this particular prerequisite with good reason, given the above-discussed potential class size. Numerosity simply is not an issue for our purposes. See Bacon v. Honda of America Manuf., Inc., 370 F.3d 565, 570 (6th Cir. 2004) (Where the number of potential litigants in the class exceeded several hundred numerosity was not a barrier to class certification).

The second prerequisite of Rule 23(a) is the commonality requirement, which dictates that there be questions of law or fact common to the proposed class. Fed.R.Civ.P. 23(a)(2). While this section of the Rule refers to "questions," case law holds that at this stage of the Rule 23 analysis, only one common question need be established to satisfy this second prerequisite. See Sprague v. General Motors Corp., 133 F.3d 388, 397 (6th Cir. 1998), cert. denied, 524 U.S. 923 (1998).

At the prerequisite stage, plaintiffs are required only to make "a modest factual showing sufficient to demonstrate that [they] and potential plaintiffs together were victims of a common policy or plan that violated the law." Scholtisek v. The Eldere Corp., 229 F.R.D. 381,

64

387 (W.D. N. Y. 2005) (citing <u>Hoffman v. Sbarro, Inc.</u>, 982 F. Supp. 249, 261 (S.D. N.Y.

1997)).  In other words, the commonality requirement is to be "construed permissively."  <u>See</u>

<u>Speulveda v. Wal-Mart Stores, Inc.</u>, 237 F.R.D. 229, 244-46 (C.D. Cal. 2006), <u>aff'd in part and</u>

<u>reversed in part</u>, 275 Fed. Appx. 672 (9th Cir. 2008).  Accordingly, the mere existence of shared

legal issues even with divergent factual predicates will be considered to be sufficient to meet the

more lenient standards of Rule 23(a)(2) as opposed to the more stringent requirement, sometimes

referred to as "predominance," found in Rule 23(b)(3), a requirement that the common questions

of fact or law predominate.  <u>Id</u>.

       To put the matter differently, to meet the commonality requirement of Rule

23(a)(2), a party need not convince the Court that the common question or questions are the

predominant questions in the case, but only that common questions do exist.  <u>Id</u>.  On the other

hand, under the more demanding test of Rule 23(b)(3), the Court may only certify class action if

common questions of law or fact predominate over those questions that affect individual

members of a proposed class *and* a class action is found to be superior to other available methods

for the fair and efficient adjudication of the lawsuit.  Fed.R.Civ.P. 23(b)(3).  <u>Leuthold v.</u>

<u>Destination America, Inc.</u>, 224 F.R.D. 462, 469-70 (N.D. Cal. 2004).  <u>See also</u> <u>Beattie v. Century</u>

<u>Tel., Inc.</u>, 511 F.3d 554, 564 (6th Cir. 2007) ("To satisfy the predominance requirement of Rule

23(b)(3), a plaintiff must establish that the issues in the class action that are subject to

generalized proof ... predominate over those issues that are subject only to individualized

proof.").

       In addressing the question of predominance, the Court is to determine whether

common questions lie at the heart of the litigation.  <u>Powers v. Hamilton County Public Defender</u>

Commission, 501 F.3d 592, 619 (6th Cir. 2007).  Further, "the mere fact that questions peculiar to each individual member of the class action remain after the common questions of the defendant's liability have been resolved does not dictate the conclusion that a class action is impermissible." Sterling v. Velsicol Chem. Corp., 855 F.2d 1188, 1197 (6th Cir. 1988).  Unless it is clear that individual issues will overwhelm the common questions and render the class action valueless as a vehicle to promote efficient litigation, the predominance requirement of Rule 23(b)(3) will be satisfied.  In re Cardizem, C.D. Antitrust Litigation, 200 F.R.D. 297, 307 (E.D. Mich. 2001).

It is at this point that the Court is most concerned with the ability of England to satisfactorily demonstrate that the alleged common questions of law and fact predominate over individual questions peculiar to each Plaintiff employee so as to make the proposed class action a superior means to fairly and efficiently adjudicate the present controversy.  The primary common question relied on by England as the basis for satisfying the commonality requirement of Rule 23(a)(2) is the question of whether Advance Auto had an unwritten, *de facto* policy of requiring its hourly wage employees to work off-the-clock and to work without their statutorily mandated lunch and rest breaks required by KRS 337.355 and 337.365.

Examination of the evidence to date reveals that Advance Auto has provided England with copies of its employee handbook and employee training materials.  All of these sources indicate that the company's written policy is to comply with both federal and state wage and hour laws.  In fact, the company materials caution that not only is off-the-clock work prohibited, but that managers who require their employees to work off-the-clock are subject to termination by the company.  England's position on this documentary evidence is that it is little more than the corporate equivalent of window dressing created and maintained to forestall

aggrieved employees such as himself from recovering wages due them as the result of the company's unwritten policy of requiring exactly what its handbook and training materials prohibit.

England insists that the same is true with respect to the missed lunch and rest breaks.  While Advance Auto may in public and in its company materials maintain that such meal and rest breaks are to be provided as required by state law, the same *de facto* policies of the company prevent its Kentucky employees from receiving what the Kentucky Wages and Hours Act plainly requires.

England's allegation of an unwritten company policy that violates the Kentucky Wages and Hours Act in these respects might be sufficient, standing alone, to satisfy the lesser standard of Rule 23(a)(2) and its commonality requirement.  Accepting for the moment England's belief that such a *de facto* policy does exist statewide, the factual question of its existence and the legal consequences thereof would be a common question of both law and fact that would in the Court's view satisfy the first hurdle of the commonality prerequisite.  The problem, however, for England is that the nature of his claims, and the type of evidence required to prove them, does not satisfy the more demanding requirement of predominance needed to bring a Rule 23(b)(3) class action.[9]

Were the Court to attempt to proceed with a Rule 23(b)(3) class action, it would quickly find itself swamped with individual issues related to each of the plaintiff employee class

---

[9]  The Court notes that England is proceeding only under the Kentucky Wages and Hours Act rather than the FLSA.  As a consequence, his suit is not a proposed opt-in collective action under federal substantive law, nor are his class-related claims of a type that would fall within the parameters of a (b)(1)(a) or (b)(2) class, with the latter class action established to address those lawsuits in which the nature of the relief sought is primarily injunctive.

members.  One must keep in mind that England must establish a statewide *de facto* company policy of requiring off-the-clock work and of denying lunch and rest breaks.  The written materials of the company run entirely contrary to such a theory. England as a result will be forced to proceed store-by-store and employee-by-employee to determine first whether the same daily close procedures employed at Store 8520 were also required and taught by the store managers at the other 85 Kentucky stores.

Even within each store, it also must be determined whether all of the managers and assistant managers followed the same unwritten clock-out procedure as that employed at Store 8520.  Such an exercise would require dozens, if not more, of depositions directed to each of the store's various managers and employees in order to confirm that the alleged *de facto* policy does in fact exist.[10]  The practical import of this situation is that even as to the question of liability, apart from damages, the Court will be faced with class action claims that are primarily individual in nature with proof being required from a multitude of hourly wage managers and employees across a number of stores to determine initially whether such a *de facto* unwritten policy even existed.

This is not the only difficulty with maintaining a class action.  There is also the question of calculating damages and considering Advance Auto's potential defenses to liability. Certainly, England estimates his own off-the-clock work to be ten minutes of uncompensated time for each evening that he closed his own former store.  He suggests that the same

---

[10]  As earlier noted, England apparently bases his claim of such a *de facto* policy solely upon his experience at Store 8520 and the one day that he worked at the Advance Auto store in Russell Springs, Kentucky.  Based only on this experience, he formed the belief that a statewide *de facto* policy requiring off-the-clock work and denying employees lunch and rest breaks existed within the company.

approximation may be assumed for each of the potential employee class members to calculate an appropriate amount of damages for the class as a whole to recover.  This approach, however, is unjust to Advance Auto.  England's former employer is entitled to determine initially whether other employees at other stores were ever required to work off-the-clock.  Just as importantly, Advance Auto is entitled to know how long each of those other employees actually did work off-the-clock and on what occasions they did so.

Not every potential class member of England's proposed class will have been required to work off-the-clock, and for those who were, the amount of time they spent and the number of such occasions will vary substantially.  Advance Auto will be stripped of its opportunity to question the frequency and duration of the alleged violations if England's assumptions are adopted without question.  Also, such an approach would deprive Advance Auto of many of its fact-related potential defenses, unless the company has the opportunity to question each of the potential class members to (1) rebut the existence of any alleged *de facto* unlawful policies concerning wages and hours, and (2) establish just exactly what, if any, uncompensated time was imposed on each class member and on what occasions.

Obviously, different managers and assistant managers within the same store may well have had different practices and internal policies regarding when that particular store's employees were required to clock out during the daily closing procedure.  If this matter is certified as a class action, the very real prospect exists that the district court may be forced to endure dozens, perhaps hundreds, of mini-trials on such issues.  Several other courts faced with the prospect of employee class actions involving claims of off-the-clock work and denied lunch and rest breaks have reached exactly the same conclusion that the Court reaches in this opinion -

69

- that common issues do not predominate and that a class action would not be a superior vehicle by which to adjudicate the interest of the potential plaintiff employee class.

One of the most recent decisions to address the question of class certification in the context of an action brought based on claims of off-the-clock work and denied meal and rest breaks is Robinson v. Wal-Mart Stores, Inc., 253 F.R.D. 396, 401-02 (S.D. Miss. 2008). In Robinson, current and former employees of Wal-Mart brought a putative class action against Wal-Mart alleging that they were required by the company to work off-the-clock.  Id.  Wal-Mart in response to the employees' lawsuit moved to dismiss the complaint or in the alternative strike the class action allegations from it.  After assuming that the plaintiff employees had satisfied the four requirements of Rule 23(a), the District Court for the Southern District of Mississippi continued to take up the question of whether class-wide claims predominated so as to make a class action the superior means by which to resolve the claims of the potential class members.

The district court, after setting forth the certification requirements under Rule 23(b)(3), continued in its opinion to offer up the following analysis:

> In the case *sub judice*, because the amount of damages each putative class member could recover is dependent upon the amount of time he or she worked off-the-clock and/or the number of rest/meal breaks he or she was denied while employed by Wal-Mart, the court finds it would be required to make individualized calculations to determine the amount of recovery, if any, as to each member.  In this circuit, however, '[w]here the plaintiffs' damages claims focused almost entirely on facts and issues specific to individuals, rather than the class as a whole, the potential exists that the class action may degenerate in practice into multiple lawsuits separately tried [thereby making] class certification ... inappropriate.

Robinson, 253 F.R.D. at 402 (citing O'Sullivan v. Countrywide Home Loans, Inc., 319 F.3d 732, 744-45 (5th Cir. 2003)).

70

In reaching this conclusion, the district court in <u>Robinson</u> relied heavily on another case involving a putative class action for unpaid work and denied lunch and rest breaks, <u>Basco v. Wal-Mart Stores, Inc.</u>, 216 F. Supp.2d 592 (E.D. La. 2002).  Just as in <u>Robinson</u>, the district court in <u>Basco</u> concluded that the predominance requirement of Rule 23(b)(3) was not satisfied in the context of a proposed class action for off-the-clock work explaining that

> Individual issues also predominate plaintiffs' claims that they were required to work off-the-clock.  In this instance ... the individualized issues will arise from the myriad of possibilities that could be afforded to explain why any one of the plaintiffs worked off-the-clock.  As defendant noted, as to any of the class members that may argue that: (1) the particular class member did not in fact work off-the-clock, (2) any instructions received to work off-the-clock without compensation were outside the scope of authority and directly contrary to the well-established policy and practices [of the company], (3) even if a particular class member did work off-the-clock, that employee unreasonably failed to avail [himself or herself] of curative steps provided by defendant to be compensated for that work, (4) if a class member received instructions from a fellow class member such as a personnel manager or hourly supervisor to work off-the-clock and/or not to request a time adjustment, then the class member unreasonably relied on instructions directly contrary to Wal-Mart's express policy, (5) a class member had an actual and/or constructive knowledge of Wal-Mart's policies banning off-the-clock work and voluntarily chose to engage in such work in deviance of that policy for any one of a number of reasons, and (6) a particular class member has a unique animus toward Wal-Mart or its employees that would cause that class member to fabricate or inflate his or her claims.  Defendants have the right to present their defenses as to each plaintiff's claim that he/she was required to work off-the-clock to the jury.

<u>Basco</u>, 216 F. Supp.2d at 603.

The Court in this instance agrees entirely with the <u>Robinson</u> and <u>Basco</u> decisions and their observations on the absence of predominant claims if plaintiffs's putative class action for off-the-clock work proceeds in the district court.  What the Court would be left with in this

71

instance, as noted, is a series of mini-trials on questions of both liability and damages involving if not hundreds, at a minimum, dozens of plaintiff employees who would rightfully be required to come forward and prove that they were required by their manager(s) to work off-the-clock and/or were denied lunch and rest breaks, when such events did occur, the duration of such events (particularly with regard to off-the-clock work) and their resulting losses, both monetary and non-monetary.

At the same time, Advance Auto would be entitled to raise any of the above defenses appropriate as to each of the individual Plaintiff employees.  Simply put, a class action in the context of the present wage and hour claims as they now stand would not involve predominantly class-wide common issues, nor would it be a superior means of pursuing relief. Therefore, the Court shall deny class action status as the Plaintiff has failed to establish as a matter of law the requirement of predominance of common issues under Rule 23(b)(3).

## CONCLUSION

The Court has carefully examined the many arguments raised by both of the parties.  Its review leads the Court to conclude first that adequate time for discovery has been afforded the Plaintiff, who has been given an additional seven months in which to come forward with any further proof following this Court's prior discovery order entered in January of 2009. To the extent that the Plaintiff continues to seek such additional discovery in reliance on Rule 56(f), his request is unavailing given the procedural history of the case.

The Court further concludes that a private cause of action does exist under Kentucky law for damages suffered as the result of the denial of statutorily required lunch and

72

rest breaks.  While the Kentucky Wages and Hours Act of KRS Chapter 337 contains no express grant of a private right of action for these violations, the language of KRS 446.407 persuades the Court that Kentucky employees are entitled to seek individual relief for the violation of either KRS 337.355 or KRS 337.365 where KRS 337 imposes a civil penalty on employers for the violation of either of these statutes.  That being said, the Court finds no factual basis in the record for a reasonable juror to impose punitive damages on the Defendant.

The claim of the Plaintiff for off-the-clock work is not a *de minimis* one in the view of the Court, nor does the Court conclude that Advance Auto has extinguished the claim by tendering solely the $194 amount sought without consideration of any of the other potential forms of recovery under the Act, such as liquidated damages, attorney's fees and costs.  The Court concludes in similar fashion that England has set forth sufficient proof on which a reasonable juror could conclude that he unlawfully was required to work off-the-clock in violation of Kentucky law on those days on which he was responsible for the daily store closing at his store.  In this regard, the Court rejects the reasoning of <u>Seever</u> in the factual context of the present case, given the complete absence of the significant equitable considerations that were so material to the outcome of <u>Seever</u>.

Finally, the Court concludes that the Plaintiff has failed as a matter of law to carry his burden under Rule 23 of the Federal Rules of Civil Procedure to establish that class action claims predominate and that institution of a class action would be a superior and more efficient means by which to resolve the parties' wage and hour dispute under Rule 23(b)(3).  For these reasons, the Court shall enter a separate order that **GRANTS IN PART AND DENIES  IN PART** the motion of the Defendant for summary judgment as set forth above.

Copies to Counsel of Record